# EXHIBIT A

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
|---|---|
| | ) FOR THE NINTH JUDICIAL CIRCUIT |
| COUNTY OF CHARLESTON | ) CASE NO.: 2026-CP-10- |
| | ) |
| PATRIOT GOLD AND UTILITY VEHICLES, | ) |
| LLC, JENNIFER FRIEND, and GRANT FRIEND, | ) |
| | ) SUMMONS |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BINTELLI LLC and NORTHPOINT | ) |
| COMMERCIAL FINANCE LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**TO THE DEFENDANTS ABOVE-NAMED:**

**YOU ARE HEREBY SUMMONED** and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the Plaintiff's attorney of record within thirty (30) days after service hereof, exclusive of the day such service, and if you fail to answer the complaint, judgement by default will be rendered against you for the relief demanded in the complaint.

Dated: April 8, 2026

GORDON REES SCULLY MANSUKHANI LLP

By    *s/Christi Hunoval*

Christi Hunoval (SC 69387)
E-mail: chunoval@grsm.com
Maeve Cavanaugh (SC 107578)
E-mail: mcavanaugh@grsm.com
677 King Street, Suite 450
Charleston, SC 29403
Telephone: (843) 278-5900
***Attorneys for Plaintiffs***

1

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br><br>COUNTY OF CHARLESTON<br><br><br>PATRIOT GOLF AND UTILITY VEHICLES, LLC, JENNIFER FRIEND, and GRANT FRIEND,<br><br>Plaintiffs,<br><br>vs.<br><br>BINTELLI LLC and NORTHPOINT COMMERCIAL FINANCE LLC,<br><br>Defendants. | IN THE COURT OF COMMON PLEAS FOR THE NINTH JUDICIAL CIRCUIT<br><br>Civil Action No.:<br><br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

The Plaintiffs, Patriot Golf and Utility Vehicles, LLC ("Patriot Golf"), by and through its liquidating members Jennifer Friend and Grant Friend, and Jennifer Friend and Grant Friend, individually as guarantors (collectively, "Plaintiffs"), by and through counsel, complaining of Defendants Bintelli LLC and Northpoint Commercial Finance LLC (collectively, "Defendants"), allege as follows:

## BACKGROUND

1. Plaintiffs Jennifer Friend ("Jen") and Grant Friend ("Grant") are a married couple who, after distinguished careers in the golf and golf cart industries, made the decision to pursue their longstanding dream of opening a small business together.

2. Jen holds a degree in Accounting from the University of South Carolina and spent nearly a decade in corporate managerial accounting and financial analysis, including leadership roles at Bridgestone/Firestone and E-Z-GO/Textron Specialized Vehicles.

1

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

3. At E-Z-GO/TSV, Jen rose to a Director-level position, where she was responsible for operations, service, and used cart sales across North America, and was recognized as Director of the Year in 2014.

4. Grant has dedicated his career to the golf industry, beginning as a golf professional and later serving as Head Golf Professional and General Manager at Bristow Manor Golf Club.

5. He subsequently worked as a Sales Representative for E-Z-GO/Cushman, where he was responsible for commercial and used cart sales in multiple states and was recognized as Sales Representative of the Year in 2005.

6. In 2020, Jen and Grant founded Patriot Golf, a golf cart dealership serving the Virginia, Maryland, and Washington, D.C. region.

7. They invested their savings and relied on their combined expertise and industry relationships to establish the business.

8. Shortly after opening, the COVID-19 pandemic struck, presenting extraordinary challenges for a new small business.

9. Nevertheless, Jen and Grant worked tirelessly to keep Patriot Golf operational, adapting to rapidly changing circumstances and continuing to serve their customers.

10. Through their dedication and perseverance, Patriot Golf achieved profitability in its first year.

## PARTIES, JURISDICTION, AND VENUE

11. Patriot Golf was a Virginia limited liability company formerly operating from Manassas, Virginia. Patriot Golf has been dissolved and is in the process of winding up its affairs. Through its members and persons acting on its behalf in winding up, Patriot Golf retains

the authority and capacity to prosecute claims and protect remedies arising before dissolution and during winding up.

12. Jen and Grant Friend reside in, and are citizens of, South Carolina.

13. Bintelli is a limited liability company with its principal place of business in Charleston County, South Carolina, and it conducts business in this state.

14. Bintelli is a South Carolina-based manufacturer, assembler, distributor, and seller of electric golf carts, low-speed vehicles, and related products, which it markets and distributes through a network of authorized dealers and dealer-support programs operating from its Charleston County, South Carolina headquarters.

15. Northpoint is, upon information and belief, a nonresident business entity doing business in South Carolina, including through a dealer-floorplan financing program for inventory manufactured and distributed by Bintelli.

16. Northpoint is registered to do business in South Carolina and has a registered agent located at 100 Coastal Drive, Suite 210, Charleston, South Carolina 29492.

17. This Court has personal jurisdiction over Bintelli because Bintelli is a South Carolina resident and conducts business in this state.

18. This Court also has personal jurisdiction over Northpoint pursuant to South Carolina's long-arm statute because Northpoint has transacted business in South Carolina, contracted to supply financing and related commercial services in South Carolina, and engaged in a persistent course of conduct in South Carolina giving rise to the claims asserted herein.

19. Upon information and belief, Northpoint entered into and maintained an ongoing contractual and commercial relationship with Bintelli in South Carolina for the purpose of

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

financing dealer inventory, facilitating dealer purchases of Bintelli products, and administering the dealer-floorplan program at issue in this action.

20. Upon information and belief, the agreement and course of dealing between Northpoint and Bintelli were negotiated, at least in part, with Bintelli personnel located in South Carolina and contemplated continuing performance in and through South Carolina.

21. Upon information and belief, Bintelli administered dealer onboarding for Northpoint from South Carolina, including the intake, coordination, transmission, or processing of dealer information and documents necessary to establish and maintain floorplan financing relationships.

22. Upon information and belief, approvals, audits, curtailments, repurchase demands, payoff demands, and other program-administration activities ran through Bintelli's South Carolina operations, with Northpoint knowingly using and relying upon Bintelli's South Carolina personnel and infrastructure to implement and manage the program.

23. Upon information and belief, inventory release, MSO and title paperwork, and default-related remedies were coordinated through Bintelli's South Carolina operations, and Northpoint's financing activities were structured around and dependent upon those South Carolina-based functions.

24. Upon information and belief, Northpoint routinely directed calls, emails, funds, payment demands, instructions, and other communications into South Carolina in order to administer the program, coordinate with Bintelli, and carry out dealer-floorplan transactions.

25. Upon information and belief, the dealer agreement, floorplan documents, or related program documents expressly or implicitly contemplated performance with and through

4

Bintelli in South Carolina, including administration of inventory, documentation, funding, repayment, and default remedies.

26. Upon information and belief, Northpoint sent funds into South Carolina and/or received payments tied to transactions administered through South Carolina, thereby deriving revenue from and purposefully participating in a South Carolina-centered commercial financing channel.

27. Plaintiffs' claims against Northpoint arise from and relate directly to Northpoint's South Carolina-directed activities, including its contractual and operational relationship with Bintelli in South Carolina, its role in administering the floorplan program through South Carolina, and its conduct in connection with the transactions, obligations, defaults, remedies, and damages alleged herein.

28. By deliberately entering into and maintaining a continuing business relationship with a South Carolina manufacturer and by conducting substantial program-administration activity through South Carolina, Northpoint purposefully availed itself of the privilege of conducting business in South Carolina and could reasonably anticipate being haled into court in this State.

29. Venue is proper in Charleston County, South Carolina, because Bintelli's principal place of business is located in Charleston County and, upon information and belief, the dealer-floorplan program at issue was negotiated, administered, and performed in substantial part through Bintelli's Charleston County operations.

30. Venue is also proper as to Northpoint because Plaintiffs' claims against Northpoint arise out of the same transactions and occurrences as Plaintiffs' claims against Bintelli, and the

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

5

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

acts, omissions, and injuries complained of were committed in whole or in part through conduct directed to and occurring in Charleston County, South Carolina.

## FACTUAL ALLEGATIONS

31. In June of 2021, Plaintiffs and Bintelli commenced communications to explore the possibility of Patriot Golf becoming a dealer of Bintelli golf carts.

32. On August 10, 2021, Patriot Golf and Bintelli entered into a Bintelli LLC Dealer Agreement (the "2021 Dealer Agreement," attached hereto as **Exhibit A**).

33. The 2021 Dealer Agreement provided for a one-year term, with an automatic renewal at the end of the first year.

34. Bintelli representatives provided Plaintiffs with information for Northpoint for use in financing Patriot Golf's floorplan.

35. In September of 2021, Patriot Golf and Northpoint entered into a Loan and Security Agreement (the "Loan Agreement," attached hereto as **Exhibit B**).

36. On September 7, 2021, Jen entered into a Guaranty with Northpoint, in her individual capacity, whereby she agreed to guarantee the payment and performance of all obligations of Patriot Golf (attached hereto as **Exhibit C**).

37. On September 7, 2021, Grant entered into an identical Guaranty (attached hereto as **Exhibit D**).

38. The Loan Agreement and the Guaranties executed in favor of Northpoint provide that they are to be governed, construed, and enforced in accordance with the laws of the State of Georgia. Accordingly, the claims asserted against Northpoint arising from the Loan Agreement, the Guaranties, the Voluntary Surrender Agreement, the custody and

6

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

disposition of collateral, the application of sale proceeds, and any alleged deficiency are asserted under Georgia law.

39. On February 16, 2022, Patriot Golf and Bintelli entered into another Dealer Agreement (the "2022 Dealer Agreement," attached hereto as **Exhibit E**).

40. On January 17, 2023, upon representations from Bintelli that another dealership agreement was required, Patriot Golf and Bintelli entered into a third Dealer Agreement (the "2023 Dealer Agreement," attached hereto as **Exhibit F**).

41. Under the Dealer Agreements, Patriot Golf purchased golf carts from Bintelli for resale to retail customers and relied on Bintelli for timely delivery of inventory, warranty support, and replacement parts necessary to sell and service the golf carts.

42. Throughout the course of the dealer relationship, Bintelli engaged in a pattern of conduct that materially undermined Patriot Golf's ability to operate as a dealer and rendered the relationship economically unviable.

43. On numerous occasions, Patriot Golf placed orders for multiple golf carts at a time, often ordering ten to fifteen golf carts per order in anticipation of retail demand.

44. Despite accepting Patriot Golf's orders, Bintelli frequently failed to deliver the ordered golf carts within a reasonable time, with delays often extending for several months.

45. Even when Patriot Golf finally received the ordered golf carts, on multiple occasions the golf carts arrived damaged.

46. Bintelli repeatedly failed to timely provide warranty and replacement parts needed to repair the damaged or defective golf carts.

47. Patriot Golf promptly submitted warranty claims and requests for replacement parts in accordance with Bintelli's procedures, expecting that such parts would be provided within a commercially reasonable time.

48. Instead, Bintelli often delayed shipment of necessary warranty parts for weeks or months, leaving multiple golf carts unsellable for extended periods.

49. Under the floorplan arrangement with Northpoint, interest and financing charges began accruing based on invoicing and delivery dates provided by Bintelli.

50. On multiple occasions, Bintelli invoiced Patriot Golf for golf carts before the carts were delivered, sometimes up to approximately one week prior to delivery.

51. By invoicing prior to delivery, Bintelli caused interest and financing charges to begin accruing before Patriot Golf had possession of, or the ability to sell, the golf carts.

52. These practices further increased Patriot Golf's carrying costs and exacerbated the financial strain caused by Bintelli's delivery and parts delays.

53. As Bintelli's delays in delivering inventory and warranty parts continued, Patriot Golf's ability to operate profitably as a Bintelli dealer deteriorated.

54. Patriot Golf incurred increasing financing costs, inventory carrying expenses, and lost sales opportunities as a direct result of Bintelli's conduct.

55. Upon information and belief, Bintelli removed Patriot Golf's active dealer status on or about August 31, 2023.

56. Upon information and belief, the 2023 Dealer Agreement, in effect at that time, was terminated sometime between August 31, 2023 and October 10, 2023.

57. Following termination of the 2023 Dealer Agreement, Patriot Golf made multiple demands upon Bintelli to repurchase Patriot Golf's remaining inventory.

8

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

58. Bintelli failed and refused to timely repurchase the inventory, further compounding Patriot Golf's financial losses.

59. As a direct and proximate result of Bintelli's conduct, Patriot Golf suffered substantial damages, including lost profits, increased financing and interest expenses, inventory carrying costs, and the collapse of its business.

60. After the termination of the dealer relationship with Bintelli and due to Bintelli's actions making the relationship economically impractical, Patriot Golf fell behind on its payments to Northpoint under the Loan Agreement.

61. On March 6, 2025, Patriot Golf entered into a Voluntary Surrender Agreement with Northpoint, pursuant to which Patriot Golf surrendered thirteen golf carts and five e-bikes serving as collateral to Northpoint under the Loan Agreement (attached hereto as **Exhibit G**).

62. Upon information and belief, prior to the Voluntary Surrender Agreement, Northpoint and Bintelli entered into a repurchase agreement ("Repurchase Agreement"), under which Bintelli agreed, upon Northpoint's demand, to repurchase the items serving as collateral under the Loan Agreement.

63. Northpoint affirmed the existence of the Repurchase Agreement with Bintelli through a letter dated April 22, 2025, whereby Northpoint demanded that Bintelli repurchase two items of inventory it had repossessed from Patriot Golf (attached hereto as **Exhibit H**).

### FIRST CAUSE OF ACTION
Breach of Contract/Failure of Essential Purpose
(as against Bintelli)

64. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

9

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

65. Patriot Golf and Bintelli entered into one or more contracts for the sale of goods, including golf carts and related parts, which are governed by Article 2 of the South Carolina Commercial Code.

66. The contracts included an express warranty providing that Patriot Golf's sole and exclusive remedy for defective or damaged goods was repair or replacement of the affected parts.

67. Under S.C. Code Ann. §36-2-309, where a contract does not specify a time for performance, performance must occur within a reasonable time.

68. Bintelli failed to provide warranty replacement parts within a reasonable time, including by delaying shipment of necessary parts for weeks or months after notice of warranty claims.

69. As a result of Bintelli's delays, numerous golf carts remained unsellable for extended periods, preventing Patriot Golf from using or selling the inventory in the ordinary course of business.

70. Bintelli's failure to timely provide warranty parts rendered the repair and/or replacement remedy ineffective and illusory, thereby causing the exclusive remedy to fail of its essential purpose within the meaning of S.C. Code Ann. § 36-2-719(2).

71. Bintelli's conduct deprived Patriot Golf of the substantial benefit of the bargain and constituted a breach of the parties' contracts, including Bintelli's obligation to perform in good faith under S.C. Code Ann. § 36-1-304.

72. As a direct and proximate result of Bintelli's breach, Patriot Golf suffered damages including, but not limited to, lost profits, increased financing and interest expenses, inventory carrying costs, and consequential business losses.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

73. Because the exclusive remedy failed of its essential purpose, Patriot Golf is entitled to all remedies available under the South Carolina Commercial Code.

**SECOND CAUSE OF ACTION**
Violation of the South Carolina Unfair Trade Practices Act
(as against Bintelli)

74. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

75. Bintelli engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-20.

76. Defendant's unfair and deceptive acts include, but are not limited to:

   a. Failing to timely provide replacement warranty parts, rendering inventory unsellable and impairing Patriot Golf's ability to operate as a dealer;

   b. Invoicing golf carts prior to delivery, thereby accelerating interest accrual and financing obligations;

   c. Structuring its performance under dealership relations in a manner that predictably shifts financing costs and inventory risks onto dealers while retaining the benefits of the dealer network; and

   d. Terminating dealer agreements while actively establishing factory-direct and factory-affiliated retail locations.

77. Bintelli's conduct was unethical, oppressive, and substantially injurious to Patriot Golf, and went beyond a mere private dispute.

78. Bintelli's unfair and deceptive practices affect the public interest because they are capable of repetition and were undertaken as a part of Bintelli's standard business practices with

11

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

respect to its dealer network, posing a risk of similar harm to other current and prospective dealers in South Carolina.

79. As a direct and proximate result of Bintelli's violations of SCUTPA, Patriot Golf suffered actual and ascertainable damages, including lost profits, increased financing and interest expenses, inventory and carrying costs, and damage to its business operations.

80. Bintelli's conduct was willful and knowing, entitling Patriot Golf to treble damages pursuant to S.C. Code Ann. § 39-5-140.

81. Patriot Golf is entitled to recover actual damages, treble damages, reasonable attorney's fees and costs, and such other relief as the Court deems appropriate.

**THIRD CAUSE OF ACTION**
Violation of Ga. Code Ann. §§ 11-9-207 and 11-9-610
(as against Northpoint)

82. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

83. Northpoint is a secured party under Article 9 of the Georgia Commercial Code, and Plaintiffs are debtors and/or obligors within the meaning of Ga. Code Ann. § 11-9-102.

84. On or about March 6, 2025, Patriot Golf and Northpoint entered into a Voluntary Surrender Agreement, pursuant to which Patriot Golf released the collateral to Northpoint for disposition and application of the net proceeds to Patriot Golf's outstanding obligations.

85. Upon accepting possession of the collateral, Northpoint owed statutory duties under Article 9, including the duty to use reasonable care in the custody and preservation of the collateral and the duty to dispose of the collateral in a commercially reasonable manner.

12

86. The collateral consisted of vehicles and equipment that were subject to ongoing depreciation, and Northpoint knew or should have known that prompt disposition was necessary to preserve value and minimize losses.

87. Upon information and belief, Northpoint failed to handle the collateral with care and damaged the collateral upon the voluntary surrender, further depreciating the value of the collateral.

88. Despite obtaining possession and control of the collateral, Northpoint failed to take reasonable steps to market, resell, or otherwise dispose of the collateral within a commercially reasonable time.

89. Instead, Northpoint retained possession of the collateral for an extended period without attempting resale, while interest, fees, and other charges continued to accrue on Patriot Golf's account.

90. Northpoint's prolonged delay in disposition caused the collateral to decline in value and materially increased the outstanding indebtedness and potential deficiency.

91. Northpoint further acted in a commercially unreasonable manner by electing to dispose of the collateral through auction at a substantially reduced value, rather than pursuing commercially reasonable and value-maximizing alternatives.

92. At all relevant times, Northpoint knew or should have known that commercially reasonable alternative means of disposition existed that would have yielded higher proceeds and minimized losses, including exercising its rights under the Repurchase Agreement with Bintelli.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

93. Patriot Golf made repeated requests to Northpoint for assistance in securing Bintelli's repurchase of the collateral. At the time of these requests, the collateral was eligible for repurchase under Northpoint's Repurchase Agreement with Bintelli.

94. Rather than exercising its rights under the Repurchase Agreement, Northpoint delayed taking action, allowing the applicable repurchase period to expire as to all but two items of collateral.

95. On or about April 22, 2025, Northpoint first attempted to exercise its rights under the Repurchase Agreement, at which point only two of the original eighteen items of collateral remained within the repurchase time limitations.

96. As a result of Northpoint's delay, only two golf carts were repurchased by Bintelli pursuant to the Repurchase Agreement, while the remaining sixteen items of collateral were excluded from repurchase and instead subject to disposition through auction or other distressed sale, yielding substantially lower proceeds than would have been obtained through repurchase.

97. By way of example, certain items of collateral were sold for approximately one percent of the item's original cost, an amount so disproportionately low that it supports an inference that the disposition was not conducted in a commercially reasonable manner.

98. Northpoint's conduct rendered every material aspect of its handling and disposition of the collateral, including the time, method, manner, and terms, commercially unreasonable in violation of Ga. Code Ann. § 11-9-610(b).

99. Northpoint also failed to exercise reasonable care in the custody and preservation of the collateral while in its possession, in violation of Ga. Code Ann. § 11-9-207(a).

14

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

100. As a direct and proximate result of Northpoint's violations of Article 9, Plaintiffs have suffered damages, including but not limited to loss of collateral value, increased deficiency exposure, improperly accrued interest and fees, and other consequential damages.

101. Pursuant to Ga. Code Ann. § 11-9-625, Northpoint is liable to Plaintiffs for all damages caused by its failure to comply with Article 9, and Plaintiffs seek all relief authorized by law, including damages, declaratory relief limiting or barring any deficiency, and such other relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION
Violation of Ga. Code Ann. § 11-9-611
(as against Northpoint)

102. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

103. Plaintiffs are debtors and/or obligors within the meaning of Ga. Code Ann. § 11-9-102.

104. Pursuant to Ga. Code Ann. § 11-9-611, Plaintiffs were entitled to a reasonable signed notification of disposition before Northpoint disposed of the collateral at auction.

105. Pursuant to Ga. Code Ann. § 11-9-624, a debtor or secondary obligor may only waive the right to notification of disposition of collateral pursuant to an agreement entered into *after* default occurs.

106. Plaintiffs did not waive their right to notification of disposition of the collateral after default occurred.

107. Because Plaintiffs did not receive a signed notification of the disposition of collateral, Plaintiffs are entitled to a presumption that the value of the collateral is equal to the indebtedness.

15

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

108. Additionally, pursuant to Ga. Code Ann. § 11-9-625, Northpoint is liable to Plaintiffs for all damages caused by its failure to comply with Article 9, and Plaintiffs seek all relief authorized by law, including damages, declaratory relief limiting or barring any deficiency, and such other relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION
Fraudulent Misrepresentation/Active Concealment
(as against Northpoint)

109. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

110. In or about February 2024, Patriot Golf contacted Northpoint seeking assistance in ensuring Bintelli repurchased the inventory following the termination of the dealership relationship between Patriot Golf and Bintelli.

111. On February 21, 2024, during a phone call with Max Cummins, a representative of Northpoint, Northpoint affirmatively represented to Plaintiffs that it could "try" to assist in the repurchase demand, but that there was not "much [Northpoint] can do."

112. Upon information and belief, at the time these representations were made, Northpoint had already entered into a separate agreement with Bintelli that granted Northpoint contractual rights to demand that Bintelli take possession and repurchase the same inventory.

113. Northpoint's representations were false and misleading because they affirmatively conveyed that Northpoint lacked the ability or authority to effect or compel repurchase, while concealing the existence of Northpoint's repurchase agreement with Bintelli.

114. Northpoint knew that its representations were false or misleading at the time they were made and intended that Plaintiffs rely upon them.

16

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

115. Northpoint further knew that Plaintiffs were unaware of the Repurchase Agreement and had no reasonable means of discovering its existence.

116. Plaintiffs reasonably relied on Northpoint's representations by refraining from pursuing further action to secure repurchase, alternative disposition, or timely legal remedies during the period in which repurchase rights remained available.

117. Northpoint's misrepresentations and concealment caused Plaintiffs to lose the opportunity to obtain repurchase of the inventory at a higher value and allowed the repurchase rights to expire.

118. As a direct and proximate result of Northpoint's fraudulent misrepresentations and active concealment, Plaintiffs suffered damages, including loss of inventory value, increased indebtedness and deficiency exposure, and additional interest and carrying costs.

119. Northpoint's conduct was willful, wanton, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

**SIXTH CAUSE OF ACTION**
Negligent Misrepresentation
(as against Northpoint)

120. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

121. In the course of its business dealings with Patriot Golf, Northpoint supplied information concerning its ability to assist with or cause Bintelli's repurchase of the collateral.

122. Northpoint represented that it could not meaningfully assist with the repurchase, while failing to disclose material facts regarding its contractual rights with Bintelli, namely the existence of a Repurchase Agreement between Northpoint and Bintelli.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

123. Northpoint owed Plaintiffs a duty to make truthful representations and to not mislead Plaintiffs.

124. Northpoint failed to exercise reasonable care in communicating accurate and complete information to Plaintiffs.

125. Plaintiffs justifiably relied on Northpoint's representations and omissions to their detriment.

126. As a direct and proximate result of Northpoint's negligent misrepresentations, Plaintiffs suffered damages, including loss of collateral value, increased interest and fees, and increased deficiency exposure.

### SEVENTH CAUSE OF ACTION
Fraudulent Inducement
(as against Northpoint)

127. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

128. Northpoint, through its representatives, made false representations to Plaintiffs, namely that it was unable to assist in securing Bintelli's repurchase of the collateral.

129. Northpoint knew that its representations were false, as an agreement between Northpoint and Bintelli already existed, whereby Northpoint had the power to demand that Bintelli repurchase the collateral.

130. This false representation was made to induce Plaintiffs to enter into the Voluntary Surrender Agreement with Northpoint, as Northpoint led Plaintiffs to believe that there were no viable alternatives to the Voluntary Surrender Agreement.

131. Plaintiffs justifiably relied on Northpoint's false representations in entering into the Voluntary Surrender Agreement.

18

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

132. As a direct and proximate result of Northpoint's fraud, Plaintiffs suffered damages, including loss of collateral value, increased interest and fees, and increased deficiency exposure.

WHEREFORE, Plaintiffs respectfully pray for judgment against the Defendants for actual damages, punitive damages, special damages, and consequential damages, in an amount to be determined by the jury at the trial of this action, attorney's fees and costs in bringing this action, and for such other and further relief as this Court deems proper.

Dated: April 8, 2026                         GORDON REES SCULLY MANSUKHANI, LLP

By      _s/ Christi Hunoval_
        Christi Hunoval (SC Bar No. 69387)
        E-mail: chunoval@grsm.com
        Maeve Cavanaugh (SC Bar No. 107578)
        E-mail: mcavanaugh@grsm.com
        677 King Street, Suite 450
        Charleston, SC  29403
        Telephone: (843) 714-2505
        **_Attorney for Plaintiffs_**

## VERIFICATION

We, Jennifer Friend and Grant Friend, being duly sworn, state that we are the Plaintiffs in the foregoing action; that we have read the foregoing Complaint and know the contents thereof; and that the same is true of our own knowledge, except as to those matters stated upon information and belief, and as to those matters, we believe them to be true.


Jennifer Friend

Sworn to before me this

7th day of April, 2026.

Notary Public for South Carolina

My Commission Expires: June 8, 2033


Grant Friend

Sworn to before me this

6th day of April, 2026.



Notary Public for ~~South Carolina~~ Georgia

My Commission Expires: 02/27/2029

20

# EXHIBIT A

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



## Bintelli LLC Dealer Agreement

This Dealership Agreement ("Agreement") is made this day _____8/10/2021_____ ("Effective Date"), by and between Bintelli LLC, (a South Carolina corporation), hereafter referred to as "Bintelli" and _Patriot Golf and Utility Vehciles_(dealership name), hereafter referred to as "Dealer".

PRODUCT SELECTION

Initial Order / Stocking Requirement: Dealer agrees to make an initial minimum order of at least __15__ Bintelli Beyond Electric Vehicles within 2 weeks after signing this Agreement, unless Dealer is renewing their agreement and currently has the minimum initial order quantity in stock. If this provision is not complied with the entire agreement shall be rendered void and of no effect.

____ I am renewing my agreement and currently have the minimum initial order quantity above in stock.
____ I am renewing my agreement and do not currently have the minimum initial order quantity above in stock.
_X_ I am a new dealer that will place an order for at least the minimum initial order quantity above.

Active Dealer Status & Commitment: Upon reaching initial order quantity and continued maintenance of the six-month commitment, Dealer shale remain in Active Dealer status. Active Dealers receive 24/7 access to the Bintelli Dealer Portal and Parts websites which includes up to date inventory status, wholesale parts pricing, current specials, dealer resources (including training videos, dealership forms, advertising materials, "how-to" guides, industry news, new product unveilings, and more!) Additionally, Active Dealers receive access to the Bintelli exclusive dealer only Slack Channel, leads from Bintelli Dealer Locators, Online Pass Through, weekly free shipment of approved warranty parts, showroom sales resources, and a dedicated Bintelli account manager and support specialist.

| Product Line | Six Month Commitment |
|---|---|
| Bintelli Beyond Electric Vehicles | 45 units |

Dealer agrees to make purchases of each product from Bintelli as stated above during each 6-month period of the agreement. Please note that Bintelli will never force an order on Dealer. Bintelli will never send a dealer units without their approval. If a six-month period goes by where the minimum order requirement has not been met, Bintelli reserves the right to rescind the Active Dealer status without notice.

In addition to the purchase commitment, Dealer agrees to keep no less than ten (10) vehicles in stock at any given time for each product line it represents. If inventory decreases below ten (10) vehicles, Dealer will place a reorder within fourteen calendar days to bring the inventory back above the minimum Initial Order Quantity requirement. If Dealer fails to bring the in-stock inventory to about the minimum requirement, Bintelli reserves the right to rescind Bintelli Active Dealer Status without notice.

jason perske

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3

# BINTELLI

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

SECTION 1. DEALERSHIP

(A)Appointment

(I) Bintelli hereby appoints Dealer to be a retail Dealer of the product lines chosen in Product Selection, along with the accessories and spare parts distributed by Bintelli.

(B)Duration of Agreement

This Agreement and the Dealership created under this Agreement shall continue in force for 1 year from the date of execution unless terminated earlier as provided herein. If all of the provisions of this Agreement are complied with, unless either party gives written notice of its election to terminate this Agreement at least sixty (60) days prior to termination, it shall automatically be renewed one (1) time for an additional one (1) year period at the expiration of each period. A new agreement must be executed at the conclusion of year two (2).

SECTION 2. OPERATION OF DEALERSHIP

(A)Purchase Price

Dealer shall purchase the Bintelli Products only from Bintelli and pay Bintelli the dealer price in effect at the time the Dealer's order is received, less any applicable discount. Pricing to change without notice. Bintelli reserves the right to charge a deposit for all orders, regardless if the final payment will be made by cash, check, or floorplan.

If a Bintelli financing partner is used to sell a Bintelli vehicle, such as, but not limited to Road Runner/ Octane, a $200.00 financing fee will be charged directly to Dealer for any deals funded in financing tiers 3-8 and will bill monthly from Bintelli to Dealer.

(B)Terms of Purchase

Dealer shall pay Bintelli for its purchases of the Product or Parts at the price described in Section 2a, on the date of invoice prior to shipment of product unless otherwise agreed to in writing. If Dealer chooses to use their own shipping carrier, a pallet surcharge will be added to the invoice to cover the cost of the pallet and packing materials. There is a 20% restocking fee for any parts returned to Bintelli.

(C)Dealership Pricing

Bintelli takes under-cutting and price gouging very seriously. While you may sell a Bintelli Beyond for any price you desire, there are minimum and maximum prices that may be advertised online. Dealer may add prep, delivery, tax, tag, and title fees in addition to these prices. You may discount as desired at the time of sale.

Beyond 4 – Minimum Advertised Price: $8,595        Maximum Advertised Price: $9,995
Beyond 6 – Minimum Advertised Price: $9,595        Maximum Advertised Price: $10,995

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

<u>Beyond 4 Lifted</u> – Minimum Advertised Price: $10,595    Maximum Advertised Price: $11,995

<u>Beyond 6 Lifted</u> – Minimum Advertised Price: $11,595    Maximum Advertised Price: $12,995

(D)Title and Risk of Loss

MSO to the Product shall be issued and mailed to Dealer on the date on which payment is received by Bintelli and a vehicle identification number has been assigned to the vehicle(s) (the "Date of Purchase") if applicable. Prior to the Date of delivery, the risk of loss to the Product shall be on Bintelli. The risk of loss shall pass to Dealer on the Date of delivery.

(E)Use of Trade Name and Trademark and Price Changes

(I) Bintelli agrees that while this Agreement continues in force, Dealer may use the product trade name(s) and/or trademark(s) in connection with the advertisement and sale of products purchased directly from Bintelli. Bintelli's trade name(s) and/or trademark(s) shall not be affixed to or advertised in connection with any merchandise or service other than the products purchased directly from Bintelli.

(II) All advertising and promotional materials containing or referring to Bintelli's trade name(s) and/or trademark(s) shall be submitted to Bintelli for approval in good faith, which shall not be unreasonably withheld.

Unless the result of a Tariff or exchange rate change, Bintelli agrees to advise Dealer of all changes in product prices not less than thirty (30) days prior to marketing any revised price.

(F)Dealer's Obligations

Dealer agrees to:

(I) Use its best efforts to promote the sale and use of the products purchased from Bintelli. All Bintelli models must be listed on dealer website within 30 days of the initial order being received.

(II) Keep at least the initial order quantity in stock for each product line. The most successful dealerships maintain one of each color of each model to ensure complete customer satisfaction while offering the best selection possible.

(III) Comply with all United States laws and regulations applicable to Bintelli Products including but not limited to those set forth by the Environmental Protection Agency, the National Highway Traffic Safety Administration, Department of Transportation (DOT), and corresponding State Vehicle Code. Dealer agrees not to re-distribute the products to other Dealers, or to export the products without written consent from Bintelli.

(IV) Support any and all Bintelli Products within their market, and shall provide warranty service to carried Bintelli Products, including parts replacement and/or repair, or any given procedure specified by Bintelli and/or state or Federal Government entity (This includes emission repairs under warranty as per described in the warranty booklet

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

JF

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



provided with the vehicle.) All Bintelli warranties are parts only so Dealer may, at their discretion, collect labor expenses for repairs directly from customer.

(V) All sales are final. It is the responsibility of the purchaser to inspect the entire shipment before signing the delivery slip. If any freight is missing, you MUST specify it on the delivery slip. Failure to do so will result in you giving up your right to a freight claim. If a delivery slip is signed and products are later to be found missing, they will not be replaced. All freight orders must be accepted. If damage occurs in transit, all damage must be explicitly noted on the bill of lading. Refusing a shipment will result in additional shipping expenses to purchaser. No refunds, returns, cancellations or exchanges for any reason after an order is approved verbally or in writing. Any disputes are resolved in Charleston County, South Carolina.

(G)Advertising by Bintelli

Bintelli agrees that it will, from time to time, purchase and place advertising promoting the sale its products. All decisions regarding the use of national, internet, regional, or local advertising, or a combination thereof, or with respect to the selection of a particular medium or advertising content shall remain with the sole discretion of Bintelli and such advertising agencies or others as it may appoint. Nothing in this Agreement shall be deemed to prohibit or prevent Dealer from engaging in any advertising or promotion of the products in addition to advertising or promotions paid for by Bintelli.

(H)Online Sale Pass Through

In an effort to quickly grow this brand of products, Bintelli retains the right to advertise and sell its vehicles online. If an online retail order is placed with Bintelli and the customer resides within 15 miles of Dealer (as the shortest route via Google Maps as deemed by Bintelli), Bintelli will offer a $1,500 profit to Dealer if Dealer currently has met all obligations of this agreement, has met the previous six month order requirement, and has at least the initial order requirement number of vehicles in stock for each product line it represents. If Dealer chooses to decline the Online Pass Through, Bintelli reserves the right to sell direct to customer. To receive the dealer profits, Dealer is responsible for receiving, assembling (if needed) and completing the PDI on the vehicle, and agrees to all future servicing and warranty work on the vehicle, as needed, during its warranty period and beyond. Dealer has the option to put the profit from the sale on their account as a credit to use immediately or can elect to have a check sent once a month for all owed profits. If Dealer chooses to use a vehicle already at their facility for the Online Sale Pass Through, Bintelli will reimburse dealer the actual cost paid on the vehicle, plus actual shipping cost to dealer, plus the $1,500 profit.

SECTION 3. WARRANTIES

(A)Warranty of Title

(I) Bintelli warrants that it has good title to the products and the right to sell it to Dealer free of any proprietary rights of any other party or any other encumbrance.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



(II) Bintelli shall not indemnify Dealer against any claim or liability based on Dealer's modification or conversion of the Product and/or the subsequent use of that modification or conversion.

(B)Limited Warranty

Bintelli includes different warranty terms and lengths for each product line. Please read warranty terms, exclusions and limitations listed in warranty guidelines as not all parts are covered for the full warranty periods.

(C)Warranty Service

Bintelli shall, at its own expense and option, either repair or replace any defective items of the product during the warranty period as specified in Section 3b, provided that Dealer has properly notified Bintelli via Bintelli's warranty form, as described in Schedule A attached to this Agreement and incorporated herein by reference as though fully set forth, and, upon inspection by Bintelli, Bintelli has found the product to be defective. Dealer's sole and exclusive remedy under this Agreement shall be limited to the repair or replacement specified herein. Dealer is entitled to free shipping of warranty parts a maximum of one time per week. Additional shipments will be charged for shipping expenses.

(D)Warranty Conditions and Disclaimer

The foregoing warranties are contingent on the proper use of the product in accordance with the instructions and specifications published by Bintelli and shall not apply to any product that has been repaired or modified by persons other than Bintelli or their authorized Bintelli dealer. The express warranties set forth in this agreement are in lieu of all other warranties, express or implied, including without limitation, any warranties of merchantability or fitness for a particular purpose.

SECTION 4. TERMINATION

(A) Termination by Bintelli

Bintelli may terminate this Agreement if Dealer fails to perform any of the terms of this Agreement. If Bintelli elects to terminate this Agreement, it shall give written notice of termination to Dealer not less than sixty (60) days prior to termination unless the termination is due to failure to purchase the minimum requirement of vehicles per six months, as no notice is required in this case. Terminated dealers, or dealers without any vehicle purchases within the last six months will be required to pay shipping charges for warranty part shipments thereafter.

(B) Termination by Dealer

Dealer may terminate this Agreement upon written notice of termination to Bintelli not less than thirty (30) days prior to the close of any calendar year, and this Agreement shall then terminate at the close of that calendar year.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



(C) Repurchase of Product by Bintelli

Upon termination of this Agreement, Bintelli is not obligated to repurchase any Product from Dealer. Should Bintelli choose to repurchase product, Bintelli will reimburse Dealer at original purchase price of Product, less 20% for the current Model Year only. All shipping costs to be paid by Dealer and vehicles must be delivered in new condition to Bintelli.

SECTION 5. GENERAL PROVISIONS

(A)Notices

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to have been properly given when deposited in the United States mail, first class certified postage prepaid and addressed to the other party at the address for that party specified in described in Schedule C attached to this Agreement and incorporated herein by reference as though fully set forth.

(B)Assignment of Agreement

Neither party shall assign this Agreement or its rights hereunder without the prior written consent of the other. Any attempt to make such an assignment without the other party's consent shall be void and are considered to be grounds to terminate this agreement.

(C)Amendments

Bintelli and Dealer agree that this Agreement may be modified by Bintelli only by a written notice sent by Bintelli to Dealer with thirty (30) days advance notice of any changes.

(D) Non waiver

Bintelli and Dealer agree that no failure to exercise or delay in exercising any right, power, or privilege under this Agreement on the part of either party shall operate as a waiver of any right, power, or privilege hereunder. Bintelli and Dealer further agree that no single or partial exercise of any right, power, or privilege under this Agreement shall preclude further exercise thereof.

(E)Severability

If any part of this Agreement is found or deemed by a court of competent jurisdiction to be invalid or unenforceable, that part shall be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

(F)Governing Law; Venue
This Agreement and any controversy arising out of or in relation to it shall be governed by the law of the State of

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

South Carolina. Dealer hereby waives any right to assert any rights or defenses within any other jurisdiction or to require that litigation regarding this Agreement take place elsewhere.

(G) Entire Agreement

This Agreement is the complete and exclusive statement of the mutual understanding of the parties, and supersedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement.

(H) Attorneys' Fees

If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.

IN WITNESS WHEREOF, this Agreement has been executed by the parties' authorized representatives on the date first written above.

Bintelli LLC, a South Carolina Corporation              2137 Savannah Highway Charleston, SC 29414

By: _____*Justin Jackrel*_____
     DocuSigned by: A2C316987DB4440...

President, Bintelli LLC.

DEALER                                                   I acknowledge I must have a qualified and competent
                                                         technician on site for proper PDI, maintenance, and warranty
By: _____*Jennifer Friend*_____                          support to my customers.
     DocuSigned by: C7E4DCAE950349B...

Dealership Owner Name: Jennifer Friend                   Initial ___*JF*___ DS

Dealership Name : Patriot Golf and Utility Vehicles      Owner Birthday: ▮▮▮▮▮▮ REDACTED

Dealership Address: 12193 Balls Ford Rd                  Shipping address the same?  _X_ Yes  ___ No

Dealership City/State: Manassas, VA                      Do you need a liftgate?  _X_ Yes  ___ No

Dealership Phone: 540-222-7550                           Dealership Fax: N/A

Dealership Email: jen@patriotgolfcart.com                Cell Phone*: 540-222-7550

*To be used only to send Bintelli specials, sales, and News updates. The texts will always be during regular business hours. The cell number provided would only be used for text purposes.

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

SCHEDULE A

Bintelli's Warranty Claims Procedure

Dealer shall properly notify Bintelli via Bintelli's warranty forms and as follows Compensation for Parts Replaced under Warranty:

At the time that an Authorized Bintelli Dealer performs any "under warranty" service, the Dealer's agent must fill out a warranty repair request form through the Dealer Portal, which shall be submitted to Bintelli before the repair is completed. Failure to follow the procedure specified automatically precludes Bintelli from liabilities related to the Warranty repair specified herewith.

For the Authorized Bintelli Dealer to be able to provide this service, it is necessary that the vehicle owner / operator presents the retailer with proof of warranty registration completed at the time the unit is first delivered. Warranty restrictions are specified in Bintelli warranty documentation supplied to both Dealer and End user. Exclusions apply as noted in this documentation.

Parts catalogs are available upon request. The parts catalogs are provided to the Authorized Bintelli Dealers with the purpose of allowing them to become familiar with the replacement parts system as well as acknowledging their ability to order or purchase parts as it is necessary to affect repair of the unit.

In the case of warranty repairs all replaced parts are property of Bintelli. The Dealer will be required to retain defective parts for 1 month in case Bintelli requires that the defective part be returned to Bintelli prior to a replacement being sent, unless directed otherwise by the warranty department.

Bintelli represents that all replacement parts are both new and genuine. Only the following generic replacement parts may be installed without previous authorization: spark plugs, screws, clamps, fluids, tires, shocks, light bulbs, batteries, and fuses.

SCHEDULE B

Notices

All notices will be sent to the addresses listed on the signature page of the dealer agreement.

SCHEDULE C

If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force.

DS
JF

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



## Bintelli Beyond Dealer Warranty Policy

1.  This limited warranty covers conversions to new vehicles, equipment furnished by Bintelli ("the company") in or upon a passenger vehicle. Vehicle has a 4 year limited parts-only warranty. Labor warranties are available for an additional charge, at the time of purchase, through our partner, EWG.

2. The company warrants to original purchaser that any defects in materials or workmanship, except as listed in paragraph #4 below, that occur within the time periods listed below ("the warranty period"), starting from the date of delivery, will be corrected by the company at its expense, in a manner described:

   a. Manufacture Warranties —These warranties are covered by the manufacture of the component, not by Bintelli directly. Lester Brand Chargers are covered for a period of four years. Eagle brand chargers are covered for a period of three years. Curtis Instruments brand controllers are covered for a period of two years. US Batteries are covered for a period of 12 months. Full warranty disclosures for these three manufacturers are available upon request.

   b. Bintelli Warranty – In addition to the manufacture warranties noted above. Bintelli will warranty the frame and all structure welds of the vehicle for a period of two years. All remaining parts not already mentioned in (a) or (b) or excluded in #4 below will be covered for a period of one year. Labor for repair is never included. The warranty included is a parts only warranty. Defective parts must be returned to Bintelli LLC before replacement.

3.  Warranty parts will be sent or given to the customer or dealer when the dealer or original purchaser notifies the company that a defect exists and Bintelli determines, as a result of its inspection or investigation, that the defect was caused by improper material or workmanship.

4.  The parts only warranty provided by Bintelli does not cover:

    a. Any costs or charges involved in transporting a vehicle or part to or from the repair facility.
    b. Any lost revenues to customer due to the defective part(s).
    c. Damages to any items caused by improper use, unauthorized repairs or modifications, attempts to operate any equipment beyond its rated capacities, or damage caused by lack of proper and reasonable maintenance.
    d. Any equipment furnished or installed by the buyer or Dealer
    e. Wear Items - tires, bulbs, fuses, bearings, brake pads, motor brushes, wiper blades, brake shoes.
    f. Any defects for components(such as radio equipment, charger, controller, batteries, etc.) which are covered by the individual component manufacturer's warranty).
    g. Any rental or replacement vehicle charges or costs associated with the need for warranty repair at our authorized facility.
    h. Any labor required to replace any warranty parts
    i. Rust and Paint related issues
    j. The motor if the vehicle is used in a rental or taxi style application

5. Warranty repairs listed above constitute the full extent of the company's warranty. There are no warranties which extend beyond those described herein, and the foregoing warranty is exclusive and is in lieu of all other warranties, whether written, oral, implied or statutory. In no event shall the company be liable for special or consequential damages or of the loss of use of the vehicle or loss of time or inconvenience to the buyer. Warranties are non-transferrable. Any disputes arising from this warranty are to be settled in Charleston, SC.

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3

REDACTED



# BINTELLI

## Bintelli LLC Credit Card Authorization and Payment Information

Company Name: Patriot Golf and Utility Vehicles    Date: 8/10/2021

Contact Person: Jennifer Friend    Phone: [REDACTED]    Fax: _____

Address [REDACTED] _____

City: [REDACTED]    State: [REDACTED]    Zip Code: [REDACTED]

This document certifies that I, Jennifer Friend authorize Bintelli LLC to charge my:

[ ] Visa    [ ] Master Card    [ ] Discover    [ ] American Express

Credit Card Number [REDACTED] _____

Security Code [REDACTED] (4 digits for AMEX, 3 for Visa/MC/Discover)

Name as it appears on the card Jennifer A Friend    Exp Date [REDACTED]

Credit Card Billing Address: [REDACTED] _____

City: [REDACTED]    State: VA    Zip Code: [REDACTED]

I agree to keep this credit card on file for all future orders. If I wish to remove this card from Bintelli files, I will submit a request in writing. While the card is on file, all orders placed will be charged to this card unless I tell Bintelli in writing I will use another payment method. I am responsible for all order totals and any collection fees if for any reason a charge is not processed or is reversed for any reason.

Signature _~DocuSigned by~_ *Jennifer Friend* C7E4DCAE950349B...    Date 8/10/2021

1) Please provide a copy of your driver's license. It must match the cardholder's name.

2) A copy of your resale certificate is required for State Sales Tax exemption. If you do not provide the certificate, you will be charged tax on your purchase.

Part payments may made by credit card, ach, check, E-Check (Intuit), or wire transfer. Only parts and accessories can be paid for with a credit card. Vehicles may be paid by ACH, E-Check (Intuit), Wire Transfer, Check, or Northpoint Flooring.

Wire transfer info:    Company Name: Bintelli LLC    Bank Name: Wells Fargo    JF
                       Routing Number: [REDACTED]    Account Number: [REDACTED]

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



## ACH Recurring Payment Authorization Form

Once you approve and invoice, our ACH system will schedule your payment to be automatically deducted from your checking or savings account. Just complete and sign this form to get started!

**Recurring Payments Will Make Your Life Easier:**
- It's convenient (saving you time and postage)
- Your payment is always on time (even if you're out of town), eliminating shipment delays

**Here's How Recurring Payments Work:**
You authorize regularly scheduled charges to your checking or savings account. You will be only be charged the amount indicated on invoices you approve. No charges will ever take place without your approval.

Please complete the information below:

I _Jennifer Friend_____ authorize Bintelli LLC to charge my bank account indicated below for future vehicle and/or part orders that I will individually confirm are approved.

| | |
|---|---|
| Billing Address | N/A |
| Phone# | N/A |
| City, State, Zip | N/A |
| Email | N/A |

Account Type:   [X] Checking        [ ] Savings

Name on Acct   N/A

Bank Name   N/A

Account Number   N/A

Bank Routing #   N/A

Bank City/State   N/A

Routing Number   Account Number

222222222   000 111 555 10

SIGNATURE _____ *Jennifer Friend*
DocuSigned by:
C7E4DCAE950349B...

DATE   8/10/2021

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify Bintelli LLC in writing of any changes in my account information or termination of this. I understand that because this is an electronic transaction, these funds may be withdrawn from my account as soon as the invoices are approved. In the case of an ACH Transaction being rejected for Non Sufficient Funds (NSF) I understand that Bintelli LLC may at its discretion attempt to process the charge again within 7 days, and agree to an additional $25 charge for each attempt returned NSF which will be initiated as a separate transaction from the authorized recurring payment. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I agree not to dispute this recurring billing with my bank so long as the transactions correspond to the terms indicated in this authorization form.

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



## Bintelli EV Pre-Delivery Checklist
(You will submit this form through the dealer portal)

Vehicle Identification Number _____     Model _____

### Post Assembly / Pre Delivery Checklist
(Inspect to ensure the following are installed and functioning properly if applicable)

- [ ] Charger and Cord
- [ ] Rear and Side View Mirrors
- [ ] Wheel Nuts Completely Tight
- [ ] Roof and Support Bolts
- [ ] VIN Plates (if street legal)
- [ ] Windshield Wiper
- [ ] Dashboard
- [ ] Front Wheel Alignment
- [ ] Reverse Beeper / Horn
- [ ] Lights – Head, Brake, Tail, Turn

- [ ] Sound System
- [ ] Batteries and Hardware Secure/Tight
- [ ] Full Speed on Test Drive
- [ ] Braking Properly
- [ ] Throttle Accelerates Properly
- [ ] Tire Pressure Acceptable
- [ ] Reverse Camera
- [ ] Visual Inspection
- [ ] Accessories Ordered are Installed
- [ ] Seat Belts

### Dealership Information

Please complete the information below once you have completed all boxes above. By signing below you are verifying that you have inspected the electric vehicle as specified above.

Dealership Name _____     Signature_____

### Customer Information

Please complete the information below once you have completed your new vehicle training. The dealership should answer any questions you may have about laws, operation, maintenance, etc. By signing below you are verifying that you have received the owner's manual, end user warranty policy, vehicle training and understand how to operate and maintain the electric vehicle, along with the risks involved with driving an electric vehicle. You also have inspected the vehicle as specified above and have found no issues or defects.

Customer Name _____     Signature _____

Date _____     Phone _____

DS
JF

DocuSign Envelope ID: D3A509C8-098E-4627-977D-8B356FF695C3



## Warranty Registration Form

(You will submit this form through the dealer portal)

Vehicle Identification Number _____        Model _____

Purchaser Name: _____        Purchase Date: _____

Phone: _____        Email: _____

Address: _____

City: _____        State: _____        Zip Code: _____

Dealership Name: _____        Dealer Phone _____

Purchaser Signature _____        Dealer Signature _____

This form must be completed and signed, and keep for your records. Electronic versions of this form will be submitted through the dealer management portal. The two forms must be completed on the dealer portal within 15 days after the sale of the vehicle. Failure to do so may void the available warranty for the end user.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# EXHIBIT B

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



# NORTHPOINT
## COMMERCIAL FINANCE

September 7, 2021

Mrs. Jennifer A. Friend, Member/Manager
Mr. Grant Friend, Member/Manager
Patriot Golf and Utility Vehicles, LLC
12193 Balls Ford Rd
Manassas, VA 20109

Re: Credit Approval

Dear Members:

Northpoint Commercial Finance LLC ("Northpoint") is pleased to inform you that we have established a $250,000.00 pay as sold line of credit on your behalf. We, like you, are eager to establish what we hope will be a longstanding, mutually beneficial relationship.

The activation of this credit facility is contingent upon the proper execution and return of the enclosed documents and the satisfaction of the conditions outlined below. Your prompt attention to these items will expedite the activation of your credit facility. If you are delayed in completing these conditions, please advise us accordingly, as the approval remains valid for 45 days and will be withdrawn if these conditions are not completed prior to that point.

1. Loan and Security Agreement to be signed by Jennifer A. Friend, Member/Manager and Grant Friend, Member/Manager.
2. Personal Guaranty to be signed by Jennifer A. Friend.
3. Personal Guaranty to be signed by Grant Friend.
4. Web Access Form

Northpoint will be filing a UCC-1 Financing Statement with the State of Virginia on your business. Under the Article 9 Revisions the debtor's signature is not required.

Once all conditions have been fully satisfied and your account has been activated your Account Manager will make contact with you in conjunction with activation and will become your primary point of contact going forward.

Please don't hesitate to contact us if we may be of further assistance during the documentation process. Thank you for choosing Northpoint Commercial Finance.

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Page 2 of 2

Sincerely,

Northpoint Commercial Finance LLC
The Credit Team
678-359-6334

**Equal Credit Opportunity Notice:** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protecting Act. The Federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington D.C. 20580. This is to advise you that if your application for business credit is denied, you have the right to a written statement of the specific reasons for denial. To obtain the statement, please contact the office listed above within sixty (60) days from the date you are notified of our decision. We will send you a written statement of the reasons for the denial within thirty (30) days of your request for the statement.

COPY VIEW

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held
by the designated custodian



# NORTHPOINT
## COMMERCIAL FINANCE

### LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this "**Agreement**") is dated as of September 3, 2021 between Patriot Golf and Utility Vehicles, LLC, a Virginia limited liability company ("**Borrower**") and Northpoint Commercial Finance LLC, a Delaware limited liability company ("**Lender**").

In consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1. **Loans.**

   Lender may from time to time advance funds (each, a "**Loan**") for acquisition, financing and/or refinancing by Borrower of inventory (individually and collectively, "**Inventory**") and for such other purposes as are acceptable to Lender. Borrower understands and agrees that each Loan will be solely at Lender's discretion, and Borrower expressly disclaims any right to expect otherwise as a result of any course of dealing between Borrower or Lender, any particular need for any such Loan by Borrower, Lender's dealings with others, Lender's arrangements with any Vendor, or otherwise. Lender may establish a credit limit for Borrower and may adjust such credit limit from time to time. Such credit limit does not constitute a commitment or committed line of credit from Lender. To be eligible for a Loan, Inventory must be: (a) serialized, unless otherwise agreed to by Lender; (b) adequately described on an invoice issued to Borrower by a manufacturer or distributor approved by Lender (each, a "**Vendor**"); (c) approved by Lender, in Lender's discretion, for financing pursuant to a program authorized by the applicable Vendor; and (d) encumbered by a first priority perfected security interest in favor of Lender.

2. **Payment.**

   (a) **Promise to Pay.** Lender may provide to Borrower, in a manner chosen by Lender from time to time, one or more of the following: a statement of financial transaction, a program letter, an approval letter, a billing statement, or other documentation identifying Inventory, the amount of the Loan for such Inventory, and the applicable interest rates and financial terms for such Loan (individually and collectively, a "**Schedule**"). Borrower's failure to notify Lender in writing of any objection to a particular Schedule within ten (10) days of the date such Schedule is first made available to Borrower shall constitute Borrower's: (a) acceptance of all terms thereof; (b) agreement that Lender is financing that Inventory at Borrower's request; and (c) agreement that that Schedule will be incorporated herein by reference. The amount of the Loan for an item of Inventory shall be deemed to be the original invoice cost ("**Invoice Cost**") of that item of Inventory as listed on the applicable Schedule. Borrower promises to pay to Lender the amount of each Loan pursuant to each applicable Schedule, together with interest and charges on the Invoice Cost and/or fees on the account as specified in each applicable Schedule and this Agreement (collectively, the "**Total Debt**"). If Borrower timely objects to the terms of any Schedule and such objection is not resolved within three (3) business days, Borrower will pay Lender for such Inventory, and the terms of such Schedule shall be deemed for all purposes to be, in accordance with the most recent terms for similar Inventory to which Borrower has not objected. All payments hereunder and under each Schedule shall be made payable to Lender and delivered to the address specified by Lender from time to time or paid in such manner as Lender may specify from time to time. As to all payments made by or on behalf of Borrower with respect to its Obligations, Lender may apply any payments received to the Obligations, or any portion thereof, in any manner and in any order as Lender may determine in its sole discretion, notwithstanding contrary instructions received. Application of payments made on Borrower's account may occur up to two (2) business days after deposit into Lender's account to allow for clearance of funds. Any payment deposited after 3:00pm prevailing time in Atlanta, Georgia into Lender's account will be deemed to have been deposited into Lender's account the next business day.

   (b) **Interest.** The Schedule for a Loan will include the applicable per annum interest rates for that Loan. Any maturity rate of interest listed on that Schedule may be charged to that Loan when the maturity date set forth on that Schedule has passed. Any applicable default rate of interest listed on that Schedule may be charged to that Loan upon the occurrence of any Default. If Borrower timely objects to the terms of any Schedule and such objection is not resolved within three (3) business days, the applicable interest rates for that Loan shall be in accordance with the most recent terms for similar Inventory to which Borrower has not objected; provided, however, if there are no prior terms, until resolution by the parties hereto, interest shall accrue at LIBOR (which is subject to change) plus twelve (12%) percent per annum. As used in this Agreement and all Schedules, "**LIBOR**" means a variable rate adjusted monthly that for any calendar month is equal to the greater of (i) the highest interest rate (rounded upwards, if necessary, to the nearest 1/1000th of 1%) published on the website bloomberg.com during the calendar month prior to such calendar month as the one-month London Interbank Offered Rate for United States dollar deposits (or, if such page shall cease to be publicly available or, if the information/description contained on such page, in Lender's sole discretion, shall cease to accurately reflect such London Interbank Offered Rate, then such rate as reported by any publicly available recognized source of similar market data selected by Lender that, in Lender's reasonable judgment, accurately reflects such London Interbank Offered Rate) and (ii) any "Minimum LIBOR" rate set forth in any applicable Schedule. Interest shall accrue and be payable monthly, in arrears, and shall be due and payable by the fifteenth (15th) day of the calendar month following the calendar month in which such interest accrues. Interest shall be calculated based upon a 360 day year and the actual number of days elapsed in such calendar month. Lender may adjust any rate of interest hereunder upon prior notice to and acceptance by Borrower (which notice may, but shall not be required to, be included in a Schedule), which acceptance shall be conclusively evidenced by Borrower's request for Loans following Lender providing notice to Borrower of the adjusted rate of interest. The adjusted rate of interest shall become effective as of the first day of the month following the month in which Borrower accepts the adjusted rate of interest. It is the intention of Lender not to charge interest pursuant to any Schedule at a rate in excess of the highest rate permitted by applicable law. In making such determination, interest on any outstanding credit amount shall be spread over the entire period that such credit amount is outstanding. If any interest rate provided for in this Agreement exceeds the legally permitted rate, the rate will automatically be reduced to the maximum rate permitted by applicable law. Any interest paid by Borrower to Lender in excess of the highest rate permitted by applicable law will be applied to reduce the outstanding principal of the Obligations, and if no Obligations remain outstanding, will be refunded to Borrower.

   (c) **Fees.** Borrower agrees to pay to Lender each of the following fees if assessed by Lender: (i) an "Audit Fee" for each audit conducted as determined by Lender, which shall be equal in each case to the Lender's actual out-of-pocket expenses incurred in connection with such audit or any minimum audit fee amount established by Lender (with audits to be conducted as frequently as Lender, in its sole discretion, deems prudent); (ii) a "Returned Payment Fee", in each case in which Lender receives a check, ACH electronic payment or other amount in payment of Obligations and such payment is returned or rejected by Lender's bank for insufficient funds or for any other reason, even if it is paid subsequently, in an amount equal to the lesser of (a) the maximum amount permitted by law or (b) $50.00; and (iii), a "Late Fee" for each payment that is not received by Lender by the 25th day of a calendar month, and on the 25th day of each successive calendar month thereafter until such past due amount is received by Lender, in an amount equal to the

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY

This is a copy view of the Authoritative Copy held

greater of (a) five percent (5%) of the amount past due for such payment and (b) $25; (iv) a "Billing Fee" in the amount equal to $25.00 for each month that Borrower requests a paper billing statement or a paper statement of financial transaction; (v) a "Live Check Fee" in an amount equal to $10.00 for each check or similar instrument that Borrower sends to Lender for payment of Obligations or for any other payment of Obligations by Borrower to Lender other than electronic payments initiated on a website provided by Lender; (vi) an "MSO Fee" in an amount of up to $100.00 per month for the administration and handling by Lender of manufacturer statements of origin, manufacturer certificates of origin, or other similar documentation; (vii) a "Low Utilization Fee" in the amount of $150 per calendar quarter for each quarter that the Borrower's credit limit is $150,000 or less and that the daily average of Loans outstanding during such calendar quarter is $25,000 or less; and (viii) any such additional fees and/or changes to the above-listed fees as Lender shall implement from time to time in connection with the servicing and/or administration of Borrower's account with Lender, to be effective as of the notice date, or such other future date as Lender shall advise, and in each case upon prior notice to and acceptance by Borrower (which notice may, but shall not be required to, be included in a Schedule), which acceptance shall be conclusively evidenced by Borrower's request for Loans following Lender sending notice to Borrower of a particular additional and/or changed fee. Delivery of any such notice by facsimile or other electronic transmission shall be equally effective as delivery of a printed notice. Borrower further agrees to pay Lender the maximum fees permitted by applicable law in respect of any requests from Borrower for accounting, listings of Collateral, statements of account, or explanations of surpluses or deficiencies. All of the foregoing fees constitute compensation to Lender for services rendered and are not interest or a charge for the use of money.

3. Collateral.
In order to secure all present and future obligations, whether under this Agreement or any other current or future agreement, Borrower hereby grants to Lender a security interest in all of Borrower's personal and fixture property of every kind and nature whether now owned or hereafter acquired and wherever located, including without limitation all goods (including without limitation inventory, equipment, and fixtures and any accessions to any of the foregoing), instruments (including without limitation promissory notes), documents, accounts (including without limitation all price protection payments, discounts, rebates, credits, factory holdbacks and incentive payments owed to Borrower by a Vendor), chattel paper whether tangible or electronic, deposit accounts, letter-of-credit rights whether or not the letter of credit is evidenced by a writing, securities and all other investment property, general intangibles (including without limitation all payment intangibles), books and records of any kind whether tangible or electronic (including without limitation all computer programs, software, tapes, discs, and media on which such books and records are stored), supporting obligations for any of the foregoing, and products and proceeds in whatever form of any of the foregoing (including without limitation proceeds in the form of insurance claims or payments) (collectively, the "**Collateral**"). Borrower agrees that the Collateral shall at all times remain personal property, shall not become affixed to or form a part of any real estate without the consent of Lender, and shall be located at Borrower's place(s) of business or at any other locations otherwise approved in writing by Lender from time to time. Lender retains the right to demand additional protection for the approval of a new location for Inventory, which includes, but is not limited to, a properly executed landlord/lienholder waiver(s). Borrower shall not remove any of the Collateral from such location(s) (except for moving Collateral between or among approved locations). Borrower shall take all actions that Lender from time to time reasonably deems necessary or appropriate to protect and perfect its security interest in the Collateral. Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto which, among other things, list the Collateral and provide any other information required to evidence the agreements set forth herein, or as may be amended from time to time, or for sufficiency or filing office acceptance. Borrower also ratifies its authorization for Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Both Borrower and Lender intend for Borrower to sell the Inventory, but only in the ordinary course of its business as Borrower normally sells such Inventory. Therefore, Borrower may sell any item of Inventory provided that: (a) no Default exists, (b) the price obtained for such item of Inventory is not less than the unpaid Total Debt attributable thereto, and (c) unless otherwise agreed to by Lender in writing in a particular case, Borrower holds all of the proceeds of any such sale in trust for, and immediately remits the unpaid Invoice Cost of such item of Inventory to, Lender. Upon demand by Lender, Borrower shall immediately remit to Lender the full unpaid Invoice Cost of any item of Inventory (which amount shall be applied in repayment of the Loan(s) relating to such item of Inventory or otherwise as determined by Lender in its sole discretion) as to which (i) Borrower receives any deposit or similar amount from a contemplated purchaser and/or (ii) Borrower enters into a contract to sell such item of Inventory. The immediately preceding sentence shall not apply to any Inventory financed by Lender under a scheduled-payment or other non-"pay as sold" program. Borrower shall bear the entire risk of loss or destruction of, or damage to, the Collateral. Borrower will procure and continuously maintain "all risk" property insurance covering each item of Collateral for the full replacement value thereof and with such loss payable and other endorsements as Lender may require, plus such other insurance as Lender may specify from time to time. Borrower shall immediately notify Lender of any loss, theft or damage to any Collateral. Lender may alter the insurance requirements under this Section 3, as Lender reasonably deems necessary, by giving written notice to Borrower. Borrower hereby agrees that Lender may act as Borrower's representative in making, adjusting and settling claims with respect to the Collateral under any such insurance policies, and endorsing Borrower's name on any drafts, checks or other instruments drawn by an insurer and relating to the Collateral. Until Borrower's presentation of proper evidence of valid insurance meeting the requirements of this Section 3 in a form and substance satisfactory to Lender, in its sole discretion, or in the event of Borrower's failure to secure and maintain insurance as herein required, Lender may, to protect and insure the Collateral, at its sole option, secure such insurance on behalf of Borrower, and Borrower hereby promises to pay to Lender on demand any amounts expended by Lender for such insurance. Insurance purchased by Lender may include coverage beyond those required by this Section 3. Lender's affiliates may act as insurance carrier, premium finance company and/or insurance administrator, and may be compensated through premium charges, commissions, premium rebates and fees. Borrower acknowledges that any insurance obtained by Lender is solely for the benefit of Lender and may be more expensive than insurance obtained by Borrower. Lender will promptly discontinue any insurance purchased by Lender upon Borrower's presentation of proper evidence of valid insurance meeting the requirements of this Section 3. Lender's acceptance of policies in lesser amounts in one instance shall not be a waiver of Borrower's obligations hereunder in any other instances. **BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT: (a) LENDER IS NOT THE MANUFACTURER OR THE SELLER OF THE INVENTORY; AND (b) LENDER HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO THE INVENTORY OF ANY NATURE OR KIND WHATSOEVER, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE MERCHANTABILITY OF THE INVENTORY, ITS FITNESS FOR A PARTICULAR PURPOSE, ITS COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS OR ITS NON-INFRINGEMENT OF THE RIGHTS OF OTHERS. BORROWER IRREVOCABLY WAIVES ANY CLAIMS AGAINST LENDER WITH RESPECT TO THE INVENTORY WHETHER FOR BREACH OF WARRANTY OR OTHERWISE. BORROWER AGREES THAT ITS OBLIGATIONS TO LENDER WITH RESPECT TO INVENTORY FINANCED BY LENDER SHALL BE ABSOLUTE AND UNCONDITIONAL AT ALL TIMES AFTER LENDER HAS ADVANCED OR COMMITTED TO ADVANCE ALL OR ANY PART OF THE INVOICE COST OF SUCH INVENTORY TO THE SELLER THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BORROWER WILL NOT DELAY PAYMENT OF ANY OBLIGATIONS TO LENDER, OR ASSERT ANY DEFENSE OR SET-OFF WITH RESPECT TO SUCH OBLIGATIONS, DUE TO A DISPUTE BETWEEN BORROWER AND A VENDOR OF INVENTORY AND REGARDLESS OF ANY DISCOUNT OR ALLOWANCE PROVIDED BY A VENDOR TO BORROWER.**

4. Borrower's Representations, Warranties and Covenants.
Borrower represents and warrants to Lender that: the execution of and performance by Borrower under the terms of this Agreement, each Schedule and related financing documents have been approved for Borrower by all necessary corporate or other action as applicable; Borrower is duly formed and is in good standing and qualified to do business in its state of organization (if applicable) and in the state(s) in which its place(s) of business is (are) located; the execution and delivery of this Agreement does not contravene any of Borrower's organizational documents or any other agreement, document or instrument to which Borrower is a party; this Agreement is a valid, binding and enforceable agreement of Borrower; Borrower lawfully possesses and owns each item of Collateral financed or refinanced by Lender for Borrower; the Collateral is free from, and will remain free from, all liens or other encumbrances, except for the security interest granted hereby and any security interests that are junior in priority to the security interest granted hereby; Borrower is a merchant engaged in the

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held by the designated custodian

business of selling the Inventory and other personal property of a kind similar to the Inventory; all information supplied and statements made by Borrower in any financial statement or other document delivered to Lender at any time is, and shall be, true, correct, complete and genuine when delivered; the Borrower is not a party to or the subject of any lawsuit, governmental investigation or proceeding or material dispute with any party, except as previously disclosed in writing to Lender; the Financial Statements and other information provided by Borrower to Lender in the credit application or otherwise have not materially changed from the date of submission of such information through the date of Borrower's signing of this Agreement; and the Financial Statements and other information provided by any guarantor of Borrower (or by any other party liable for any of Borrower's and/or its affiliates obligations to Lender and/or its affiliates) in the credit application or otherwise have not materially changed from the date of submission of such information through the date of Borrower's signing of this Agreement. Each request for a Loan by Borrower will be a reaffirmation of Borrower's representations and warranties contained herein as of the date of such request.

Borrower agrees: that the Borrower will not change its principal residence (if Borrower is an individual), its chief executive office (if Borrower is not a registered organization), or its State of organization (if Borrower is a registered organization organized under State law) without prior written consent from Lender; that Borrower will not change its name or entity type without prior consent from Lender; that Borrower will not merge or consolidate with any other party or sell, transfer, abandon, or otherwise dispose of a substantial part of Borrower's assets (other than the sale of Inventory in the ordinary course of business); to defend, at Borrower's own expense, any action, proceeding or claim affecting the Collateral; to give notice to Lender of (i) any defect or non-conformity in any shipment of the Inventory financed by Lender, or any claim of a right to reject or revoke acceptance of such Inventory for any reason, no later than five (5) days after delivery of such Inventory and (ii) any event or circumstance that has caused, or would reasonably be expected to cause, a material adverse effect on the Borrower, its business or its financial prospects, immediately upon becoming aware of such event or circumstance; to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral, this Agreement, any Schedule, or payments to be made in connection therewith (such obligation shall survive the termination of this Agreement); to pay all transportation and storage charges on the Collateral, and pay all rents and other amounts, if any, for the use of premises on which Borrower keeps any Collateral; to obtain, upon the request of Lender, waivers of interest and/or non-disturbance agreements from landlords, lienholders, warehousemen and/or bailors as to locations where any Collateral is located; that if a certificate of title is required by law with respect to any item of Collateral, Borrower shall obtain such certificate and shall note the security interest of Lender thereon and shall do everything necessary or expedient to preserve or perfect the security interest of Lender therein; that Borrower will not misuse, fail to keep in good repair, secrete or, except with Lender's prior written consent, rent, lend, assign or otherwise transfer any of the Collateral, or use the Collateral for any purpose other than in accordance with accepted industry practices; that Lender may enter upon Borrower's premises at any reasonable time to inspect the Collateral and Borrower's books and records pertaining to the Collateral with the full cooperation and assistance of Borrower, to take all such actions reasonably requested by Lender to further implement and give effect to the agreements contained in this Agreement; and to indemnify and hold harmless Lender and its affiliates from any claims, losses, costs and expenses asserted by Borrower, any customer of Borrower or any other party relating to or arising out of this Agreement or any Collateral; to deliver to Lender, within ninety (90) days after the close of each fiscal year of Borrower, Borrower's balance sheet, and statement of income ("**Financial Statements**"), certified by a recognized firm of certified public accountants as having been prepared in accordance with generally accepted accounting principles and as presenting fairly the financial condition of Borrower as of the date thereof and for the period then ended; to deliver to Lender upon request by Lender (i) copies of Borrower's quarterly Financial Statements certified by the chief financial officer of Borrower as presenting fairly the financial condition of Borrower as of the date hereof and for the period then ended and (ii) such other financial statements or information regarding Borrower or the Collateral, as Lender reasonably may request from time to time.

5. Power of Attorney.
To facilitate and carry out the purposes of this Agreement and Borrower's obligations to Lender, Borrower hereby irrevocably appoints Lender and its affiliates, as Borrower's true and lawful attorney-in-fact, with power of substitution, to do the following acts on behalf of Borrower: to prepare, execute and deliver in the name of Borrower security agreements, financing statements, Certificates of Title and Statements of Origin relating to the Collateral; to endorse Borrower's name upon any notes, checks, drafts, money orders and other forms of instruments made payable to Borrower; and generally to perform all acts and do all things necessary to preserve and protect the Collateral and Lender's rights and interest therein and to otherwise accomplish the purposes of this Agreement, including the making of affidavits and the acknowledgment of instruments as fully as if done by the Borrower. The foregoing powers are coupled with an interest and shall be irrevocable without the prior written consent of Lender, as long as any Obligations remain outstanding.

6. Default.
Borrower and Lender acknowledge that time is of the essence in this Agreement. As used in this Agreement, "**Default**" means any one or combination of the following: (a) any of Borrower's obligations to Lender and/or any affiliate of Lender under this Agreement, any Schedule or any other agreement are not paid or performed as required; (b) there occurs a default by any affiliate of Borrower under any agreement with Lender and/or any affiliate of Lender; (c) there occurs a default by Borrower under any agreement with another lender; (d) there occurs a material default by Borrower under any material agreement to which Borrower is a party; (e) any sale or other disposition of the Inventory is made by Borrower other than in compliance with Section 3 of this Agreement; (f) Borrower breaches any representation, warranty or covenant contained herein or in any other instrument or agreement delivered by Borrower to Lender or any affiliate of Lender in connection with this Agreement or any other transaction; (g) Borrower dies, ceases to do business as a going concern or there occurs a material change in the ownership or management of Borrower's business; (h) any of the Inventory is lost, damaged or destroyed and Borrower fails to pay to Lender within five (5) days thereafter (the "**Grace Period**") the unpaid Invoice Cost of such Inventory; however, If Lender seeks payment for any Inventory from the proceeds of the insurance described in Section 3 of this Agreement, then the Grace Period will not begin for such Inventory until Lender gives notice to Borrower that Borrower must make payment for such Inventory; (i) Borrower becomes insolvent or bankrupt; Borrower makes an assignment for the benefit of creditors or consents to the appointment of a trustee or receiver; a trustee or a receiver is appointed for Borrower or for a substantial part of its property without its consent; bankruptcy, reorganization or insolvency proceedings are instituted by or against Borrower; or any of the foregoing occurs with respect to any guarantor or other party liable for any of Borrower's and/or its affiliates obligations to Lender and/or its affiliates; (j) all or any part of the Inventory is attached, levied or seized upon in any proceeding and such process is not discharged within ten (10) days; (k) Lender believes that the prospect of payment or performance of Borrower's and/or its affiliates obligations to Lender and/or its affiliates is impaired, whether by reason of a material adverse change in the business prospects or financial condition of Borrower or otherwise, or, in good faith, believes that the Collateral is insufficient security for Borrower's obligations to Lender; (l) any guarantor, surety or endorser for any of Borrower's and/or its affiliate's obligations to Lender and/or its affiliates dies, defaults under any agreement with, or in favor of, Lender or any affiliate of Lender, or any guaranty of the obligations secured hereby is terminated; or (m) Lender believes that the prospect of payment or performance of the obligations of any guarantor, surety or endorser for any of Borrower's and/or its affiliate's obligations to Lender and/or its affiliates is impaired, whether by reason of a material adverse change in the business prospects or financial condition or otherwise.

7. Remedies.
If a Default occurs, the indebtedness herein described and all other debts then owing by Borrower to Lender and/or its affiliates under this Agreement or any other present or future agreement (the "**Obligations**") shall, if Lender shall so elect, become immediately due and payable, provided, however, that upon the institution of any bankruptcy, reorganization or insolvency proceedings filed by or against Borrower, the Obligations shall automatically become immediately due and payable without notice or demand of any kind. Furthermore, if a Default occurs, Lender shall have all of the rights and remedies of a Lender under the Uniform Commercial Code and any other applicable laws. Borrower agrees that Lender may, by itself or through an agent, without notice to any person and without judicial process of any kind, enter into any premises or upon any land owned, leased or otherwise under the apparent control of Borrower where Lender believes the Collateral may be, and disassemble, render unusable and/or repossess all or any items of the Collateral. Borrower expressly waives all rights to possession of the Collateral after default and all claims for injuries suffered through or loss caused by such entering and/or repossession by Lender. Borrower

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY

This is a copy view of the Authoritative Copy held

shall, upon demand by Lender, assemble the Collateral and return it to Lender at a place designated by Lender. Borrower agrees that the repurchase of any item of Collateral by the manufacturer or any distributor thereof shall constitute a commercially reasonable private sale of the Collateral by Lender, if the price obtained is equal to: (a) the then outstanding Invoice Cost of such item of Collateral, minus (b) the sum of all (i) unpaid principal curtailments on the Collateral (which Borrower agrees will approximate the depreciation of the Collateral) and (ii) amounts incurred, if any, to restore such item of Collateral to the equivalent of unused condition. Expenses of retaking, holding, preparing for sale, selling and the like shall include attorney's fees and other legal expenses and shall be the responsibility of Borrower. Borrower is also responsible to pay all other costs and expenses incurred by Lender in connection with this Agreement, including but not limited to attorneys' fees and other legal expenses in connection with or arising out of any deficiency suit, collection actions or otherwise following a Default. All such costs and expenses are payable by Borrower on demand by Lender and constitute part of the Obligations. Borrower understands that Lender's rights are cumulative and not alternative. Borrower hereby expressly waives notice of non-payment, presentment, protest, dishonor, default, intent to accelerate the maturity hereof and acceleration of the maturity hereof.

8. Termination.
Either party may terminate this Agreement at any time by prior written notice received by the other party. If Lender terminates this Agreement, Borrower agrees that (i) if Borrower is not in default hereunder, forty five (45) days prior notice of termination is reasonable and sufficient (although this provision shall not be construed to mean that shorter periods may not, in particular circumstances, also be reasonable and sufficient) and (ii) if Borrower is in default hereunder, Lender may elect to terminate this Agreement immediately upon the giving of written notice to Borrower. All outstanding, non-contingent Obligations shall survive the termination of this Agreement. Until all Obligations are performed or satisfied in full, any termination of this Agreement shall not affect Lender's security interest in the Collateral and all undertakings, agreements, covenants, warranties, and representations of Borrower contained in this Agreement or any other documents relating to or executed in connection with this Agreement shall continue to be effective. Lender shall not be required to record any terminations or satisfactions of any of Lender's liens on the Collateral unless and until all Obligations are performed or satisfied in full.

9. Miscellaneous.
Borrower authorizes Lender to give credit information about Borrower to Lender's subsidiaries, affiliates, and agents and to Vendors. Borrower can prevent Lender from sharing credit information, other than information about Lender's transactions or experience with Borrower, by giving written notice to Lender requesting Lender to not share such information. Lender may correct patent errors and fill in blanks herein. Lender may, in its sole discretion, waive a default or cure a default at Borrower's expense. Any such waiver in any particular instance or any waiver of a particular default shall not be a waiver of any other defaults at the same time or at any other time. No provision of this Agreement shall be varied or modified by any prior or subsequent statement, conduct or act of any of the parties, except by a writing specifically referring to this Agreement and signed by all parties hereto. No course of dealing, course of performance, or usage of trade shall be considered in the interpretation or enforcement of this Agreement. Borrower waives any right it may have to introduce evidence of any such course of dealing, course of performance or usage of trade. Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement, and the effect thereof shall be confined to the provision so held to be invalid or unenforceable. This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one and the same document. This Agreement and each applicable Schedule contain the entire agreement of the parties hereto with respect to the subject matter hereof. Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be equally effective as delivery of an original executed counterpart of this Agreement. Notwithstanding anything to the contrary herein, the parties signing this Agreement agree that it may be completed, signed and delivered by electronic means (including, without limitation, through the DocuSign, Inc. electronic signing system) and in one or more counterparts each of which shall be (i) an original as if signed manually by hand, and all of the counterparts of which taken together shall constitute one and the same agreement, (ii) a valid and binding agreement and fully admissible in any court of law or otherwise and under any and all state and federal rules of evidence and (iii) enforceable under UCC Section 3-309, UCC Section 3-604, or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby), without regard to any loss or destruction of any paper counterpart hereof, the parties hereto agreeing that the possession or maintenance of a signed and delivered scanned, emailed or other electronic version hereof shall constitute possession of this Agreement under UCC Section 3-309 or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby) and shall not constitute the destruction hereof and shall not result in the discharge of any obligation evidenced hereby, notwithstanding UCC Section 3-604 or any other similar law or statute. All required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided by Lender or made available by Lender (if any) to Borrower may be sent via email. Any provisions hereof contrary to, prohibited by, or invalid under applicable law shall be inapplicable hereto, deemed omitted here from, and shall not invalidate the remaining provisions hereof. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Borrower acknowledges that it has read and understood this Agreement and received a true copy hereof, and waives notice of Lender's acceptance hereof. Lender's failure to charge or accrue interest or any other fees provided herein shall not be deemed a waiver by Lender of its claim thereto. This Agreement and any related instruments and documents may be endorsed, assigned and transferred in whole or in part by Lender, and any such holder and/or assignee of this Agreement shall succeed to and be possessed of the rights of Lender under this Agreement to the extent transferred and assigned. The rights and obligations of Borrower may not be assigned without the prior written consent of Lender. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, heirs and personal representatives. All notices, demands and requests required or permitted to be given under this Agreement shall be in writing and delivered by either: (i) personal delivery; (ii) nationally recognized overnight express courier; (iii) facsimile, email or other electronic transmission, or (iv) certified mail, return receipt requested, with all postage and other costs of such delivery paid or prepaid. Delivery shall be deemed to have been made on the earliest of the date of personal delivery, the date one business day after dispatch by overnight express service, the date of confirmation of the facsimile or email transmission as provided by the transmitting equipment or the date five days after the date of mailing by certified mail. Unless and until notice is provided to the contrary, notices shall be addressed to the respective addresses set forth below or to any other or additional persons and addresses as the parties may from time to time designate in a writing sent as provided above. Any claim which Borrower may have against Lender arising out of this Agreement or the transactions contemplated herein must be asserted by Borrower within one (1) year of it accruing or else it shall be deemed waived. Borrower agrees that such period is reasonable and sufficient for it to investigate and act upon any such claim. This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Georgia without reference to conflict of laws principles. Borrower consents to the jurisdiction of the federal and state courts located in the State of Georgia for all purposes in connection with this Agreement. Borrower hereby waives and agrees not to assert any objection to the jurisdiction of any of such Courts, including the objection of inconvenient forum. Borrower further consents that any process or notice of motion or other application to any of said Courts or a Judge thereof, or any notice in connection with any proceedings hereunder, may be served inside or outside the State of or the District of Georgia by registered or certified mail, return receipt requested, to the last known address or by personal service provided a reasonable time for appearance is allowed, or in such other manner as may be permissible under the Rules of said Courts. **TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO, FOLLOWING CONSULTATION WITH LEGAL COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS WITH REGARD TO DISPUTES IN ANY WAY DIRECTLY AND/OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.**

## [SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY

This is a copy view of the Authoritative Copy held by the designated custodian

Borrower and Lender have caused this Agreement to be executed as of the date and year first above written.

**Northpoint Commercial Finance LLC**

X  *Reynolds Williams*
─────────────────────────
Reynolds Williams

Underwriter

Address for notices:
P.O. Box 1445
Alpharetta, GA 30009-1445

**Patriot Golf and Utility Vehicles, LLC**

X  *Jennifer Friend*
─────────────────────────
**Jennifer A. Friend**
Member/Manager

Address for notices:
12193 Balls Ford Rd.
Manassas, VA 20109

Email Address of Borrower: jen@patriotgolfcart.com

**Patriot Golf and Utility Vehicles, LLC**

X  [signature]
─────────────────────────
**Grant Friend**
Member/Manager

Address for notices:
12193 Balls Ford Rd.
Manassas, VA 20109



COPY VIEW

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# EXHIBIT C

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held by the designated custodian

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



# NORTHPOINT
## COMMERCIAL FINANCE

### GUARANTY

This Guaranty (this "**Guaranty**") is dated as of September 7, 2021 by Jennifer A. Friend ("**Guarantor**") in favor of Northpoint Commercial Finance LLC, a Delaware limited liability company and its affiliates (individually and collectively "**Northpoint**"). As used in this Guaranty, affiliates of Northpoint Commercial Finance LLC includes any party that, directly or indirectly, (i) controls Northpoint Commercial Finance LLC, (ii) is controlled by Northpoint Commercial Finance LLC, or (iii) is under common control with Northpoint Commercial Finance LLC.

Northpoint may, from time to time, extend financial accommodations to Patriot Golf and Utility Vehicles, LLC ("**Obligor**").

Northpoint is unwilling to extend, or continue to extend, financial accommodations to Obligor, unless Guarantor unconditionally guarantees to Northpoint the payment and performance of all obligations of Obligor at any time owing to Northpoint.

With knowledge that Northpoint will extend, or continue to extend, financial accommodations to Obligor in reliance upon the existence of this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.    <u>Guaranty</u>. Guarantor unconditionally, absolutely, and irrevocably guarantees to Northpoint, without off-set or deduction, the prompt payment and performance of all indebtedness, obligations and liabilities of Obligor at any time owing to Northpoint, whether direct or indirect, matured or unmatured, primary or secondary, or certain or contingent (individually, a "**Guaranteed Obligation**" and collectively, the "**Guaranteed Obligations**"). This Guaranty is a guaranty of payment and not a guaranty of collection. Guarantor guarantees to Northpoint the punctual and faithful performance by Obligor of each and every Guaranteed Obligation. If Obligor defaults in the payment or performance of any Guaranteed Obligation, if there exists any event or condition which, with notice or the passage of time or both, would constitute a default under any Guaranteed Obligation, or if there is a liquidation, bankruptcy, assignment for the benefit of creditors or similar proceeding affecting the status, existence, assets or obligations of Obligor, Guarantor shall pay directly to Northpoint the sums that Obligor is obligated to pay to Northpoint, whether by acceleration or otherwise, and promptly perform all other Guaranteed Obligations. If Northpoint is required to return any payment made to Northpoint by or on behalf of Obligor, whether as a result of Obligor's bankruptcy, reorganization or otherwise, Guarantor acknowledges that this Guaranty covers all such amounts.

2.    <u>Continuing Nature of Guaranty</u>. This Guaranty is a continuing guarantee and shall apply without regard to the form or the amount of the Guaranteed Obligations in existence at any time. Guarantor may prospectively revoke this Guaranty by sending written notice, by certified mail, return receipt requested, to Northpoint at the address for Northpoint specified below (the "**Revocation Notice**"). The revocation of this Guaranty shall not be effective with respect to any Guaranteed Obligation arising on or prior to the date occurring fifteen (15) days after Northpoint's receipt of the Revocation Notice (the "**Revocation Date**") or arising at any time after the Revocation Date, if arising as the result of a commitment made by Northpoint to Obligor on or prior to the Revocation Date.

3.    <u>Absolute Nature of Guaranty</u>. The obligations of Guarantor under this Guaranty are absolute and unconditional. Nothing shall discharge or satisfy the liability of Guarantor under this Guaranty except the full performance and payment of the Guaranteed Obligations. It is the obligation of Guarantor to discharge the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether or not particularly described herein. Guarantor is not entering into this Guaranty in reliance on the value or the availability of any of the Collateral. Guarantor acknowledges that Guarantor may be required to pay the Guaranteed Obligations, in full, without the assistance or support of any other party. Guarantor has not been induced to enter into this Guaranty on the basis that any party other than Obligor will be liable to perform any Guaranteed Obligation or that Northpoint will look to any other party to perform any Guaranteed Obligation. Guarantor shall not be released from such obligations for any reason, nor shall such obligations be reduced, diminished or discharged for any reason, including, without limitation,:

    (a)  <u>Modifications and Indulgences</u>. Any modification, renewal, or alteration of any agreement, document, or instrument relating to any Guaranteed Obligation, or any indulgence, waiver, adjustment, preference, extension, or compromise made by Northpoint in favor of Obligor or Guarantor.

    (b)  <u>Condition of Obligor or Guarantor</u>. Any insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or similar proceeding affecting Obligor or Guarantor; any sale, lease, or other disposition of any of the assets of Obligor or Guarantor; or any reorganization of, or change in the composition of, the shareholders, partners, or members of Obligor or Guarantor.

    (c)  <u>Invalidity of Guaranteed Obligations</u>. The invalidity, illegality, or unenforceability of any Guaranteed Obligation for any reason whatsoever, including, without limitation,: the existence of valid defenses, counterclaims, or off-sets to any Guaranteed Obligation; the violation of applicable usury laws by any Guaranteed Obligation; or the inauthenticity of any document or instrument relating to the Guaranteed Obligations.

    (d)  <u>Release of Obligor</u>. Any complete or partial release of Obligor or any other party from any Guaranteed Obligation.

    (e)  <u>Release of Collateral; Care of Collateral; Status of Liens</u>. Any release, surrender, exchange, deterioration, waste, loss, or impairment of any collateral securing payment of any Guaranteed Obligation (the "**Collateral**"), whether negligent or willful; the failure of Northpoint or

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held by the designated custodian

THIS IS A COPY

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

any other party to exercise reasonable care in the preservation, protection, sale or other treatment of any of the Collateral; the failure of Northpoint to create or perfect any security interest intended to be given by Obligor in connection with any Guaranteed Obligation (a "**Security Interest**"); the unenforceability of any Security Interest; the subordination of any Security Interest to any other lien or encumbrance; or the taking or accepting by Northpoint of any other security for, or assurance of payment of, any Guaranteed Obligation.

(f) <u>Other Action or Inaction</u>. Any other action or inaction on the part of Northpoint, including, without limitation, any failure of Northpoint to timely enforce any right or remedy available to Northpoint in connection with the Guaranteed Obligations, whether or not such action or inaction (i) prejudices Guarantor, (ii) increases the likelihood that Guarantor will be required to pay or perform any Guaranteed Obligation, or (iii) exposes the Guarantor to greater liability under this Guaranty.

4. <u>Waivers</u>. Guarantor waives:

(a) <u>Action Against Others</u>. Any right to require Northpoint to: institute suit or exhaust remedies against Obligor or any other party liable for any Guaranteed Obligation; enforce Northpoint's rights in any of the Collateral or other security that is at any time given to secure any Guaranteed Obligation; enforce Northpoint's rights against any other guarantor of any Guaranteed Obligation; join Obligor or any other party liable for any Guaranteed Obligation in any action seeking to enforce this Guaranty; or exhaust any other remedies available to Northpoint or resort to any other means of obtaining payment or performance of any Guaranteed Obligation.

(b) <u>Official Code of Georgia</u>. The provisions of Section 10-7-24 of the Official Code of Georgia; any right to direct the application of payments provided for in Section 13-4-42 of the Official Code of Georgia or any similar law of Georgia or any other state, or of the United States.

(c) <u>Notices</u>. Notice of the amount of credit extended by Northpoint to Obligor at any time, whether primary or secondary; notice of the modification or extension of any Guaranteed Obligation; notice of a default or other non-performance by Obligor in connection with any Guaranteed Obligation; notice of the transfer or disposition by Northpoint of any Guaranteed Obligation; notice of the repossession, sale or other disposition of any of the Collateral; notice of the acceptance of this Guaranty by Northpoint; demand and presentation for payment upon Obligor or any other party liable for any Guaranteed Obligation; protest, notice of protest, and diligence of bringing suit against Obligor or any other party; and any other notices that Guarantor might otherwise be entitled by law.

(d) <u>Defenses</u>. Any defenses to the payment and performance of Guarantor's obligations under this Guaranty, including, without limitation, (i) any defenses based on suretyship or impairment of the collateral or the like and (ii) any defenses arising by reason of any claim or defense based upon an election of remedies by Northpoint that, in any manner, impairs, affects, reduces, releases, destroys, or extinguishes Guarantor's subrogation rights, rights to proceed against Obligor or against any other party or security, including, without limitation, any defense based upon an election of remedies by Northpoint under the provisions of Section 580(d) of the California Code of Civil Procedure, or any similar law of California or any other state, or of the United States.

(e) <u>Marshal</u>. Any right to require Northpoint to marshal any assets in favor of Guarantor or against or in payment of any or all the Guaranteed Obligations.

(f) <u>Subrogation</u>. Until all Guaranteed Obligations are paid in full, any right which Guarantor may at any time have against Obligor, or any other party liable for any Guaranteed Obligation, as the result of the performance by Guarantor of its obligations under this Guaranty, including, but not limited to, contractual, statutory, and common law rights of subrogation, reimbursement, indemnification, contribution, and other rights of recourse whatsoever.

5. <u>Representations and Warranties</u>. Guarantor represents and warrants to Northpoint that:

(a) <u>Benefit</u>. Guarantor has received, or will receive, direct or indirect benefit from the creation of the Guaranteed Obligations.

(b) <u>No Representation by Northpoint</u>. Neither Northpoint nor any other party has made any representation, warranty, or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

(c) <u>Financial Condition</u>. As of the date hereof, and after giving effect to this Guaranty and the contingent obligations contained herein, Guarantor is solvent and has assets which, when fairly valued, exceed its liabilities.

6. <u>Default</u>. Guarantor will be in breach of this Guaranty if any one or combination of the following occur: (a) any of Guarantor's obligations to Northpoint under this Guaranty or under any other agreement with or in favor of Northpoint are not paid or performed as required; (b) Guarantor breaches any representation, warranty or covenant contained in this Guaranty or in any other agreement with or in favor of Northpoint; (c) Guarantor ceases to do business as a going concern or there occurs a material change in the ownership or management of Guarantor's business; (d) Guarantor becomes insolvent or bankrupt; Guarantor makes an assignment for the benefit of creditors or consents to the appointment of a trustee or receiver; a trustee or a receiver is appointed for Guarantor or for a substantial part of its property without its consent; bankruptcy, reorganization or insolvency proceedings are instituted by or against Guarantor; (e) Northpoint believes that the prospect of payment or performance of Guarantor's obligations to Northpoint is impaired, whether by reason of a material adverse change in the business prospects or financial condition of Guarantor or otherwise.

7. <u>Miscellaneous</u>. **TO THE EXTENT PERMITTED BY LAW, GUARANTOR, FOLLOWING CONSULTATION WITH LEGAL COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS WITH REGARD TO DISPUTES IN ANY WAY DIRECTLY AND/OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY.** This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Georgia, without reference to applicable conflict of laws principles.

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held by the designated custodian

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

Guarantor consents to the jurisdiction and venue of state and federal courts located in the State of Georgia in connection with Northpoint's enforcement of any of Guarantor's obligations under this Guaranty. Guarantor waives and agrees not to assert any objection to the jurisdiction of any of such courts, including the objection of inconvenient forum. Guarantor consents that any process or notice of motion or other application to any of said courts or a judge thereof, or any notice in connection with any proceedings hereunder, may be served inside or outside the State of or the District of Georgia by registered or certified mail, return receipt requested, to the last known address or by personal service provided a reasonable time for appearance is allowed, or in such other manner as may be permissible under the Rules of said Courts. This Guaranty shall not be deemed to create any right in any party except as provided herein and shall inure to the benefit of, and be binding upon, the permitted successors and assigns of Guarantor and Northpoint. Guarantor agrees that Northpoint may, without the consent of, or notice to, Guarantor, assign all or any portion of its rights hereunder to any other party to which any Guaranteed Obligation is transferred, assigned or negotiated. Guarantor shall be liable for all attorneys' fees and other costs and expenses incurred by Northpoint in connection with Northpoint's enforcement of this Guaranty. No provision of this Guaranty shall be varied or modified by any prior or subsequent statement, conduct or act of any of the parties, except by a writing specifically referring to this Guaranty and signed by Guarantor and Northpoint. Any provision of this Guaranty held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Guaranty, and the effect thereof shall be confined to the provision so held to be invalid or unenforceable. This Guaranty contains the entire agreement with respect to the subject matter hereof. Any signature delivered by Guarantor by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a "PDF file") shall be deemed an original signature hereto. Notwithstanding anything to the contrary herein, the parties signing this Guaranty agree that it may be completed, signed and delivered by electronic means (including, without limitation, through the DocuSign, Inc. electronic signing system) and in one or more counterparts, each of which shall be (i) an original as if signed manually by hand, and all of the counterparts of which taken together shall constitute one and the same agreement, (ii) a valid and binding agreement and fully admissible in any court of law or otherwise and under any and all state and federal rules of evidence and (iii) enforceable under UCC Section 3-309, UCC Section 3-604, or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby), without regard to any loss or destruction of any paper counterpart thereof, the parties hereto agreeing that the possession or maintenance of a signed and delivered scanned, emailed or other electronic version hereof shall constitute possession of this Agreement under UCC Section 3-309 or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby), and shall not constitute the destruction hereof and shall not result in the discharge of any obligation evidenced hereby, notwithstanding UCC Section 3-604 or any other similar law or statute. All required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided by Northpoint or made available by Northpoint (if any) to Borrower may be sent via email by Northpoint to Borrower at the following email address jen@patriotgolfcart.com. The section headings contained in this Guaranty are for reference purposes only and shall not affect in any way the meaning or interpretation of this Guaranty. The obligations of Guarantor may not be assigned without the prior written consent of Lender. All notices, demands and requests required or permitted to be given under this Guaranty shall be in writing and delivered by certified mail, return receipt requested, with all postage and other costs of such delivery paid or prepaid. Delivery shall be deemed to have been made on the date five days after the date of mailing by certified mail. Unless and until notice is provided to the contrary, notices shall be addressed to Northpoint's address set forth below. Any claim that Guarantor may have against Northpoint arising out of this Guaranty or the transactions contemplated herein must be asserted by Guarantor within one (1) year of it accruing or else it shall be deemed waived. Guarantor agrees that such period is reasonable and sufficient for it to investigate and act upon any such claim.

GUARANTOR:

X  _Jennifer Friend_
DocuSigned by:
A2041FA09752486...

**Jennifer A. Friend, individually**

Address for notices to Northpoint:
Northpoint Commercial Finance
P.O. Box 1445
Alpharetta, GA 30009-1445

# EXHIBIT D

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian



# NORTHPOINT
## COMMERCIAL FINANCE

### GUARANTY

This Guaranty (this "**Guaranty**") is dated as of September 7, 2021 by Grant Friend ("**Guarantor**") in favor of Northpoint Commercial Finance LLC, a Delaware limited liability company and its affiliates (individually and collectively "**Northpoint**"). As used in this Guaranty, affiliates of Northpoint Commercial Finance LLC includes any party that, directly or indirectly, (i) controls Northpoint Commercial Finance LLC, (ii) is controlled by Northpoint Commercial Finance LLC, or (iii) is under common control with Northpoint Commercial Finance LLC.

Northpoint may, from time to time, extend financial accommodations to Patriot Golf and Utility Vehicles, LLC ("**Obligor**").

Northpoint is unwilling to extend, or continue to extend, financial accommodations to Obligor, unless Guarantor unconditionally guarantees to Northpoint the payment and performance of all obligations of Obligor at any time owing to Northpoint.

With knowledge that Northpoint will extend, or continue to extend, financial accommodations to Obligor in reliance upon the existence of this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.  <u>Guaranty</u>. Guarantor unconditionally, absolutely, and irrevocably guarantees to Northpoint, without off-set or deduction the prompt payment and performance of all indebtedness, obligations and liabilities of Obligor at any time owing to Northpoint, whether direct or indirect, matured or unmatured, primary or secondary, or certain or contingent (individually, a "**Guaranteed Obligation**" and collectively the "**Guaranteed Obligations**"). This Guaranty is a guaranty of payment and not a guaranty of collection. Guarantor guarantees to Northpoint the punctual and faithful performance by Obligor of each and every Guaranteed Obligation. If Obligor defaults in the payment or performance of any Guaranteed Obligation, if there exists any event or condition which, with notice or the passage of time or both, would constitute a default under any Guaranteed Obligation, or if there is a liquidation, bankruptcy, assignment for the benefit of creditors or similar proceeding affecting the status, existence, assets or obligations of Obligor, Guarantor shall pay directly to Northpoint the sums that Obligor is obligated to pay to Northpoint, whether by acceleration or otherwise, and promptly perform all other Guaranteed Obligations. If Northpoint is required to return any payment made to Northpoint by or on behalf of Obligor, whether as a result of Obligor's bankruptcy, reorganization or otherwise, Guarantor acknowledges that this Guaranty covers all such amounts.

2.  <u>Continuing Nature of Guaranty</u>. This Guaranty is a continuing guarantee and shall apply without regard to the form or the amount of the Guaranteed Obligations in existence at any time. Guarantor may prospectively revoke this Guaranty by sending written notice, by certified mail, return receipt requested, to Northpoint at the address for Northpoint specified below (the "**Revocation Notice**"). The revocation of this Guaranty shall not be effective with respect to any Guaranteed Obligation arising on or prior to the date occurring fifteen (15) days after Northpoint's receipt of the Revocation Notice (the "**Revocation Date**") or arising at any time after the Revocation Date, if arising as the result of a commitment made by Northpoint to Obligor on or prior to the Revocation Date.

3.  <u>Absolute Nature of Guaranty</u>. The obligations of Guarantor under this Guaranty are absolute and unconditional. Nothing shall discharge or satisfy the liability of Guarantor under this Guaranty except the full performance and payment of the Guaranteed Obligations. It is the obligation of Guarantor to discharge the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether or not particularly described herein. Guarantor is not entering into this Guaranty in reliance on the value or the availability of any of the Collateral. Guarantor acknowledges that Guarantor may be required to pay the Guaranteed Obligations, in full, without the assistance or support of any other party. Guarantor has not been induced to enter into this Guaranty on the basis that any party other than Obligor will be liable to perform any Guaranteed Obligation or that Northpoint will look to any other party to perform any Guaranteed Obligation. Guarantor shall not be released from such obligations for any reason, nor shall such obligations be reduced, diminished or discharged for any reason, including, without limitation,:

    (a)  <u>Modifications and Indulgences</u>. Any modification, renewal, or alteration of any agreement, document, or instrument relating to any Guaranteed Obligation, or any indulgence, waiver, adjustment, preference, extension, or compromise made by Northpoint in favor of Obligor or Guarantor.

    (b)  <u>Condition of Obligor or Guarantor</u>. Any insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or similar proceeding affecting Obligor or Guarantor; any sale, lease, or other disposition of any of the assets of Obligor or Guarantor; or any reorganization of, or change in the composition of, the shareholders, partners, or members of Obligor or Guarantor.

    (c)  <u>Invalidity of Guaranteed Obligations</u>. The invalidity, illegality, or unenforceability of any Guaranteed Obligation for any reason whatsoever, including, without limitation,: the existence of valid defenses, counterclaims, or off-sets to any Guaranteed Obligation; the violation of applicable usury laws by any Guaranteed Obligation; or the inauthenticity of any document or instrument relating to the Guaranteed Obligations.

    (d)  <u>Release of Obligor</u>. Any complete or partial release of Obligor or any other party from any Guaranteed Obligation.

    (e)  <u>Release of Collateral; Care of Collateral; Status of Liens</u>. Any release, surrender, exchange, deterioration, waste, loss, or impairment of any collateral securing payment of any Guaranteed Obligation (the "**Collateral**"), whether negligent or willful; the failure of Northpoint or

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

2:26-cv-01965-RMG    Date Filed 05/15/26    Entry Number 1-1    Page 51 of 86

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

This is a copy view of the Authoritative Copy held
by the designated custodian

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

any other party to exercise reasonable care in the preservation, protection, sale or other treatment of any of the Collateral; the failure of Northpoint to create or perfect any security interest intended to be given by Obligor in connection with any Guaranteed Obligation (a "**Security Interest**"); the unenforceability of any Security Interest; the subordination of any Security Interest to any other lien or encumbrance; or the taking or accepting by Northpoint of any other security for, or assurance of payment of, any Guaranteed Obligation.

(f) Other Action or Inaction. Any other action or inaction on the part of Northpoint, including, without limitation, any failure of Northpoint to timely enforce any right or remedy available to Northpoint in connection with the Guaranteed Obligations, whether or not such action or inaction (i) prejudices Guarantor, (ii) increases the likelihood that Guarantor will be required to pay or perform any Guaranteed Obligation, or (iii) exposes the Guarantor to greater liability under this Guaranty.

4. Waivers. Guarantor waives:

(a) Action Against Others. Any right to require Northpoint to: institute suit or exhaust remedies against Obligor or any other party liable for any Guaranteed Obligation; enforce Northpoint's rights in any of the Collateral or other security that is at any time given to secure any Guaranteed Obligation; enforce Northpoint's rights against any other guarantor of any Guaranteed Obligation; join Obligor or any other party liable for any Guaranteed Obligation in any action seeking to enforce this Guaranty; or exhaust any other remedies available to Northpoint or resort to any other means of obtaining payment or performance of any Guaranteed Obligation.

(b) Official Code of Georgia. The provisions of Section 10-7-24 of the Official Code of Georgia; any right to direct the application of payments provided for in Section 13-4-42 of the Official Code of Georgia or any similar law of Georgia or any other state, or of the United States.

(c) Notices. Notice of the amount of credit extended by Northpoint to Obligor at any time, whether primary or secondary; notice of the modification or extension of any Guaranteed Obligation; notice of a default or other non-performance by Obligor in connection with any Guaranteed Obligation; notice of the transfer or disposition by Northpoint of any Guaranteed Obligation; notice of the repossession, sale or other disposition of any of the Collateral; notice of the acceptance of this Guaranty by Northpoint; demand and presentation for payment upon Obligor or any other party liable for any Guaranteed Obligation; protest, notice of protest, and diligence of bringing suit against Obligor or any other party; and any other notices that Guarantor might otherwise be entitled by law.

(d) Defenses. Any defenses to the payment and performance of Guarantor's obligations under this Guaranty, including, without limitation, (i) any defenses based on suretyship or impairment of the collateral or the like and (ii) any defenses arising by reason of any claim or defense based upon an election of remedies by Northpoint that, in any manner, impairs, affects, reduces, releases, destroys, or extinguishes Guarantor's subrogation rights, rights to proceed against Obligor or against any other party or security, including, without limitation, any defense based upon an election of remedies by Northpoint under the provisions of Section 580(d) of the California Code of Civil Procedure, or any similar law of California or any other state, or of the United States.

(e) Marshal. Any right to require Northpoint to marshal any assets in favor of Guarantor or against or in payment of any or all the Guaranteed Obligations.

(f) Subrogation. Until all Guaranteed Obligations are paid in full, any right which Guarantor may at any time have against Obligor, or any other party liable for any Guaranteed Obligation, as the result of the performance by Guarantor of its obligations under this Guaranty, including, but not limited to, contractual, statutory, and common law rights of subrogation, reimbursement, indemnification, contribution, and other rights of recourse whatsoever.

5. Representations and Warranties. Guarantor represents and warrants to Northpoint that:

(a) Benefit. Guarantor has received, or will receive, direct or indirect benefit from the creation of the Guaranteed Obligations.

(b) No Representation by Northpoint. Neither Northpoint nor any other party has made any representation, warranty, or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

(c) Financial Condition. As of the date hereof, and after giving effect to this Guaranty and the contingent obligations contained herein, Guarantor is solvent and has assets which, when fairly valued, exceed its liabilities.

6. Default. Guarantor will be in breach of this Guaranty if any one or combination of the following occur: (a) any of Guarantor's obligations to Northpoint under this Guaranty or under any other agreement with or in favor of Northpoint are not paid or performed as required; (b) Guarantor breaches any representation, warranty or covenant contained in this Guaranty or in any other agreement with or in favor of Northpoint; (c) Guarantor ceases to do business as a going concern or there occurs a material change in the ownership or management of Guarantor's business; (d) Guarantor becomes insolvent or bankrupt; Guarantor makes an assignment for the benefit of creditors or consents to the appointment of a trustee or receiver; a trustee or a receiver is appointed for Guarantor or for a substantial part of its property without its consent; bankruptcy, reorganization or insolvency proceedings are instituted by or against Guarantor; (e) Northpoint believes that the prospect of payment or performance of Guarantor's obligations to Northpoint is impaired, whether by reason of a material adverse change in the business prospects or financial condition of Guarantor or otherwise.

7. Miscellaneous. **TO THE EXTENT PERMITTED BY LAW, GUARANTOR, FOLLOWING CONSULTATION WITH LEGAL COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS WITH REGARD TO DISPUTES IN ANY WAY DIRECTLY AND/OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY.** This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Georgia, without reference to applicable conflict of laws principles.

DocuSign Envelope ID: F7FAC3C7-0472-4C0A-ADD1-7A78C6160998

THIS IS A COPY

This is a copy view of the Authoritative Copy held by the designated custodian

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

Guarantor consents to the jurisdiction and venue of state and federal courts located in the State of Georgia in connection with Northpoint's enforcement of any of Guarantor's obligations under this Guaranty. Guarantor waives and agrees not to assert any objection to the jurisdiction of any of such courts, including the objection of inconvenient forum. Guarantor consents that any process or notice of motion or other application to any of said courts or a judge thereof, or any notice in connection with any proceedings hereunder, may be served inside or outside the State of or the District of Georgia by registered or certified mail, return receipt requested, to the last known address or by personal service provided a reasonable time for appearance is allowed, or in such other manner as may be permissible under the Rules of said Courts. This Guaranty shall not be deemed to create any right in any party except as provided herein and shall inure to the benefit of, and be binding upon, the permitted successors and assigns of Guarantor and Northpoint. Guarantor agrees that Northpoint may, without the consent of, or notice to, Guarantor, assign all or any portion of its rights hereunder to any other party to which any Guaranteed Obligation is transferred, assigned or negotiated. Guarantor shall be liable for all attorneys' fees and other costs and expenses incurred by Northpoint in connection with Northpoint's enforcement of this Guaranty. No provision of this Guaranty shall be varied or modified by any prior or subsequent statement, conduct or act of any of the parties, except by a writing specifically referring to this Guaranty and signed by Guarantor and Northpoint. Any provision of this Guaranty held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Guaranty, and the effect thereof shall be confined to the provision so held to be invalid or unenforceable. This Guaranty contains the entire agreement with respect to the subject matter hereof. Any signature delivered by Guarantor by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a "PDF file") shall be deemed an original signature hereto. Notwithstanding anything to the contrary herein, the parties signing this Guaranty agree that it may be completed, signed and delivered by electronic means (including, without limitation, through the DocuSign, Inc. electronic signing system) and in one or more counterparts, each of which shall be (i) an original as if signed manually by hand, and all of the counterparts of which taken together shall constitute one and the same agreement, (ii) a valid and binding agreement and fully admissible in any court of law or otherwise and under any and all state and federal rules of evidence and (iii) enforceable under UCC Section 3-309, UCC Section 3-604, or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby), without regard to any loss or destruction of any paper counterpart hereof, the parties hereto agreeing that the possession or maintenance of a signed and delivered scanned, emailed or other electronic version hereof shall constitute possession of this Agreement under UCC Section 3-309 or any other similar statute (with any provision contained in the UCC or other law to the contrary being waived hereby), and shall not constitute the destruction hereof and shall not result in the discharge of any obligation evidenced hereby, notwithstanding UCC Section 3-604 or any other similar law or statute. All required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided by Northpoint or made available by Northpoint (if any) to Borrower may be sent via email by Northpoint to Borrower at the following email address jen@patriotgolfcart.com. The section headings contained in this Guaranty are for reference purposes only and shall not affect in any way the meaning or interpretation of this Guaranty. The obligations of Guarantor may not be assigned without the prior written consent of Lender. All notices, demands and requests required or permitted to be given under this Guaranty shall be in writing and delivered by certified mail, return receipt requested, with all postage and other costs of such delivery paid or prepaid. Delivery shall be deemed to have been made on the date five days after the date of mailing by certified mail. Unless and until notice is provided to the contrary, notices shall be addressed to Northpoint's address set forth below. Any claim that Guarantor may have against Northpoint arising out of this Guaranty or the transactions contemplated herein must be asserted by Guarantor within one (1) year of it accruing or else it shall be deemed waived. Guarantor agrees that such period is reasonable and sufficient for it to investigate and act upon any such claim.

**GUARANTOR:**

X _____
<br>DocuSigned by:
<br>D5CDBE91D0884E8...
<br>**Grant Friend, individually**

Address for notices to Northpoint:
Northpoint Commercial Finance
P.O. Box 1445
Alpharetta, GA 30009-1445

# EXHIBIT E

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



## Bintelli LLC Dealer Agreement

2/16/2022

This Dealership Agreement ("Agreement") is made this day _____ ("Effective Date"), by and between Bintelli LLC, (a South Carolina corporation), hereafter referred to as "Bintelli" and Patriot Golf and Utility Vehicles LLC (dealership name), hereafter referred to as "Dealer".

### PRODUCT SELECTION

<u>Initial Order / Stocking Requirement:</u> Dealer agrees to make an initial minimum order of at least $^{15}$ _____ Bintelli Electric Vehicles within 2 weeks after signing this Agreement, unless Dealer is renewing their agreement and currently has the minimum initial order quantity in stock. If this provision is not complied with the entire agreement shall be rendered void and of no effect.

___ I am renewing my agreement and currently have the minimum initial order quantity above in stock.
___ I am renewing my agreement and do not currently have the minimum initial order quantity above in stock.
_X_ I am a new dealer that will place an order for at least the minimum initial order quantity above.

<u>Active Dealer Status & Commitment:</u> Upon reaching initial order quantity and continued maintenance of the six-month commitment, Dealer shall remain in Active Dealer status. Active Dealers receive 24/7 access to the Bintelli Dealer Portal and Parts websites which includes up to date inventory status, wholesale parts pricing, current specials, dealer resources (including training videos, dealership forms, advertising materials, "how-to" guides, industry news, new product unveilings, and more!) Additionally, Active Dealers receive leads from Bintelli Dealer Locators, Online Pass Through, weekly free shipment of approved warranty parts, showroom sales resources, and a dedicated Bintelli account manager and support specialist.

| Product Line | Six Month Order Commitment | |
| --- | --- | --- |
| Bintelli Beyond Electric Vehicles | 45 | units |
| Bintelli Nemesis Electric Vehicles | 15 | units |

Dealer agrees to make orders of each product line from Bintelli as stated above during each 6-month period of the agreement. Please note that Bintelli will never force an order on Dealer. Bintelli will never send a dealer units without their approval. With the current lead times within the Electric Vehicle industry averaging 3-6 months from the time of order, it is necessary for Dealer to ensure enough vehicles are on order in advance to satisfy the six month commitment. If a six-month period goes by where the minimum order requirement has not been met, Bintelli reserves the right to rescind the Active Dealer status without notice.

In addition to the purchase commitment, Dealer agrees to keep no less than fifteen (15) vehicles in stock and/or on order at any given time for each product line it represents. If inventory decreases below fifteen (15) vehicles, Dealer will place a reorder within ten calendar days to bring the inventory back above the minimum Initial Order Quantity requirement. If Dealer fails to bring the in-stock inventory to about the minimum requirement, Bintelli reserves the right to rescind Bintelli Active Dealer Status without notice.

Blake Smith

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

## SECTION 1. DEALERSHIP

### (A)Appointment

(I) Bintelli hereby appoints Dealer to be a retail Dealer of the product lines chosen in Product Selection, along with the accessories and spare parts distributed by Bintelli.

### (B)Duration of Agreement

This Agreement and the Dealership created under this Agreement shall continue in force for 1 year from the date of execution unless terminated earlier as provided herein. If all of the provisions of this Agreement are complied with, unless either party gives written notice of its election to terminate this Agreement at least sixty (60) days prior to termination, it shall automatically be renewed one (1) time for an additional one (1) year period at the expiration of each period. A new agreement must be executed at the conclusion of year two (2).

## SECTION 2. OPERATION OF DEALERSHIP

### (A)Purchase Price

Dealer shall purchase the Bintelli Products only from Bintelli and pay Bintelli the dealer price in effect at the time the Dealer's order is received, less any applicable discount. Pricing to change without notice. Bintelli reserves the right to charge a deposit for all orders, regardless if the final payment will be made by cash, check, or floorplan.

If a Bintelli financing partner is used to sell a Bintelli vehicle, such as, but not limited to Road Runner/ Octane, a $200.00 financing fee will be charged directly to Dealer for any deals funded in financing tiers 3-8 and will bill monthly from Bintelli to Dealer.

### (B)Terms of Purchase

Dealer shall pay Bintelli for its purchases of the Product or Parts at the price described in Section 2a, on the date of invoice prior to shipment of product unless otherwise agreed to in writing. If Dealer chooses to use their own shipping carrier, a pallet surcharge will be added to the invoice to cover the cost of the pallet and packing materials. There is a 20% restocking fee for any parts returned to Bintelli.

### (C)Dealership Pricing

Bintelli takes under-cutting and price gouging very seriously. While you may sell a Bintelli Beyond for any price you desire, there are minimum ($500 below current pricing on BintelliEV.com) and maximum ($1,000 above current pricing on BintelliEV.com) prices that may be advertised online. Dealer may add prep, delivery, tax, tag, and title fees in addition to these prices. You may discount as desired at the time of sale.

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



**(D) Title and Risk of Loss**

MSO to the Product shall be issued and mailed to Dealer on the date on which payment is received by Bintelli and a vehicle identification number has been assigned to the vehicle(s) (the "Date of Purchase") if applicable. Prior to the Date of delivery, the risk of loss to the Product shall be on Bintelli. The risk of loss shall pass to Dealer on the Date of delivery.

**(E) Use of Trade Name and Trademark and Price Changes**

(I) Bintelli agrees that while this Agreement continues in force, Dealer may use the product trade name(s) and/or trademark(s) in connection with the advertisement and sale of products purchased directly from Bintelli. Bintelli's trade name(s) and/or trademark(s) shall not be affixed to or advertised in connection with any merchandise or service other than the products purchased directly from Bintelli.

(II) All advertising and promotional materials containing or referring to Bintelli's trade name(s) and/or trademark(s) shall be submitted to Bintelli for approval in good faith, which shall not be unreasonably withheld.

Unless the result of a Tariff or exchange rate change, Bintelli agrees to advise Dealer of all changes in product prices not less than thirty (30) days prior to marketing any revised price.

**(F) Dealer's Obligations**

Dealer agrees to:

(I) Use its best efforts to promote the sale and use of the products purchased from Bintelli. All Bintelli models must be listed on dealer website within 30 days of the initial order being received.

(II) Keep at least the initial order quantity in stock for each product line. The most successful dealerships maintain one of each color of each model to ensure complete customer satisfaction.

(III) Comply with all United States laws and regulations applicable to Bintelli Products including but not limited to those set forth by the Environmental Protection Agency, the National Highway Traffic Safety Administration, Department of Transportation (DOT), and corresponding State Vehicle Code. Dealer agrees not to re-distribute the products to other Dealers, or to export the products without written consent from Bintelli.

(IV) Employ trained technicians that can repair any issue that occurs on a product Dealer sells. Dealer will support any and all Bintelli Products within their market, and shall provide warranty service to carried Bintelli Products, including parts replacement and/or repair, or any given procedure specified by Bintelli and/or state or Federal Government entity. All Bintelli warranties are parts only so Dealer may, at their discretion, collect labor expenses for repairs directly from customer.

(V) All sales are final. It is the responsibility of the purchaser to inspect the entire shipment before signing the delivery slip. If any freight is missing, you MUST specify it on the delivery slip. Failure to do so will result in you

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



giving up your right to a freight claim. If a delivery slip is signed and products are later to be found missing, they will not be replaced. All freight orders must be accepted. If damage occurs in transit, all damage must be explicitly noted on the bill of lading. Refusing a shipment will result in additional shipping expenses to purchaser. No refunds, returns, cancellations or exchanges for any reason after an order is approved verbally or in writing. Any disputes are resolved in Charleston County, South Carolina.

(VI) Have a loading dock or ramps on site that can unload vehicles from the back of a semi-truck. Recommended ramps such as 144" x 14" Big Boy EZ Rizer Loading Ramps with a 2,000lb load capacity on Amazon.

I understand

(G)Advertising by Bintelli

Bintelli agrees that it will, from time to time, purchase and place advertising promoting the sale its products. All decisions regarding the use of national, internet, regional, or local advertising, or a combination thereof, or with respect to the selection of a particular medium or advertising content shall remain with the sole discretion of Bintelli and such advertising agencies or others as it may appoint. Nothing in this Agreement shall be deemed to prohibit or prevent Dealer from engaging in any advertising or promotion of the products in addition to advertising or promotions paid for by Bintelli.

(H)Online Sale Pass Through

In an effort to quickly grow this brand of products, Bintelli retains the right to advertise and sell its vehicles online. If an online retail order is placed with Bintelli and the customer resides within 15 miles of Dealer (as the shortest route via Google Maps as deemed by Bintelli), Bintelli will offer a $1,500 profit to Dealer if Dealer currently has met all obligations of this agreement, has met the previous six month order requirement, and has at least the initial order requirement number of vehicles in stock for each product line it represents. If Dealer chooses to decline the Online Pass Through, Bintelli reserves the right to sell direct to customer. To receive the dealer profits, Dealer is responsible for receiving, assembling (if needed) and completing the PDI on the vehicle, and agrees to all future servicing and warranty work on the vehicle, as needed, during its warranty period and beyond. Dealer has the option to put the profit from the sale on their account as a credit to use immediately or can elect to have a check sent once a month for all owed profits. If Dealer chooses to use a vehicle already at their facility for the Online Sale Pass Through, Bintelli will reimburse dealer the actual cost paid on the vehicle, plus actual shipping cost to dealer, plus the $1,500 profit.

(I)Leads

Bintelli offers two lines of electric vehicles - Nemesis and Beyond. Dealerships in Active Status (having met their purchase commitments for the previous 6-months) receive any generated leads in their area for lines they actively carry and are in Active Status for. For example, if there is a lead for a Nemesis within a dealers territory, but they only stock and order Beyonds, and/or if they stock Nemesis but are not in Active Status, the Nemesis lead will not be sent.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



SECTION 3. WARRANTIES

(A) Warranty of Title

(I) Bintelli warrants that it has good title to the products and the right to sell it to Dealer free of any proprietary rights of any other party or any other encumbrance.

(II) Bintelli shall not indemnify Dealer against any claim or liability based on Dealer's modification or conversion of the Product and/or the subsequent use of that modification or conversion.

(B) Limited Warranty

Bintelli includes different warranty terms and lengths for each product line. Please read warranty terms, exclusions and limitations listed in warranty guidelines as not all parts are covered for the full warranty periods.

(C) Warranty Service

Bintelli shall, at its own expense and option, either repair or replace any defective items of the product during the warranty period as specified in Section 3b, provided that Dealer has properly notified Bintelli via Bintelli's warranty form, as described in Schedule A attached to this Agreement and incorporated herein by reference as though fully set forth, and, upon inspection by Bintelli, Bintelli has found the product to be defective. Dealer's sole and exclusive remedy under this Agreement shall be limited to the repair or replacement specified herein. Dealer is entitled to free shipping of warranty parts a maximum of one time per week. Additional shipments will be charged for shipping expenses.

(D) Warranty Conditions and Disclaimer

The foregoing warranties are contingent on the proper use of the product in accordance with the instructions and specifications published by Bintelli and shall not apply to any product that has been repaired or modified by persons other than Bintelli or their authorized Bintelli dealer. The express warranties set forth in this agreement are in lieu of all other warranties, express or implied, including without limitation, any warranties of merchantability or fitness for a particular purpose.

SECTION 4. TERMINATION

(A) Termination by Bintelli

Bintelli may terminate this Agreement if Dealer fails to perform any of the terms of this Agreement. If Bintelli elects to terminate this Agreement, it shall give written notice of termination to Dealer not less than sixty (60) days prior to termination unless the termination is due to failure to purchase the minimum requirement of vehicles per six months, as no notice is required in this case. Terminated dealers, or dealers without any vehicle purchases within the last six months will be required to pay shipping charges for warranty part shipments thereafter.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

**(B) Termination by Dealer**

Dealer may terminate this Agreement upon written notice of termination to Bintelli not less than thirty (30) days prior to the close of any calendar year, and this Agreement shall then terminate at the close of that calendar year.

**(C) Repurchase of Product by Bintelli**

Upon termination of this Agreement, Bintelli is not obligated to repurchase any Product from Dealer. Should Bintelli choose to repurchase product, Bintelli will reimburse Dealer at original purchase price of Product, less 20% for the current Model Year only. All shipping costs to be paid by Dealer and vehicles must be delivered in new condition to Bintelli.

**SECTION 5. GENERAL PROVISIONS**

**(A) Notices**

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to have been properly given when deposited in the United States mail, first class certified postage prepaid and addressed to the other party at the address for that party specified in described in Schedule C attached to this Agreement and incorporated herein by reference as though fully set forth.

**(B) Assignment of Agreement**

Neither party shall assign this Agreement or its rights hereunder without the prior written consent of the other. Any attempt to make such an assignment without the other party's consent shall be void and are considered to be grounds to terminate this agreement.

**(C) Amendments**

Bintelli and Dealer agree that this Agreement may be modified by Bintelli only by a written notice sent by Bintelli to Dealer with thirty (30) days advance notice of any changes.

**(D) Non waiver**

Bintelli and Dealer agree that no failure to exercise or delay in exercising any right, power, or privilege under this Agreement on the part of either party shall operate as a waiver of any right, power, or privilege hereunder. Bintelli and Dealer further agree that no single or partial exercise of any right, power, or privilege under this Agreement shall preclude further exercise thereof.

**(E) Severability**

If any part of this Agreement is found or deemed by a court of competent jurisdiction to be invalid or unenforceable, that part shall be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

**(F)Governing Law; Venue**

This Agreement and any controversy arising out of or in relation to it shall be governed by the law of the State of South Carolina. Dealer hereby waives any right to assert any rights or defenses within any other jurisdiction or to require that litigation regarding this Agreement take place elsewhere.

**(G)Entire Agreement**

This Agreement is the complete and exclusive statement of the mutual understanding of the parties, and supersedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement.

**(H)Attorneys' Fees**

If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.

IN WITNESS WHEREOF, this Agreement has been executed by the parties' authorized representatives on the date first written above.

Bintelli LLC, a South Carolina Corporation                2137 Savannah Highway Charleston, SC 29414

By: _____ *Justin Jackrel* _____                                    2/16/2022
        A2C316987DB4440...

President, Bintelli LLC.

DEALER                                        I acknowledge I must have a qualified and competent
                                              technician on site for proper PDI, maintenance, and warranty
By: _____ *Patriot Golf Cart* _____       support to my customers.
        C7E4DCAE950349B...
Dealership Owner Name: Jennifer Friend                                    Initial __ *PGL* __

Dealership Name : Patriot Golf and Utility LLC            Owner Birthday: ▉▉▉▉  REDACTED

Dealership Address:  12193 Balls Ford Rd                  Shipping address the same? _X_Yes ___No

Dealership City/State: VA                                 Do you need a liftgate?      _X_Yes ___No

Dealership Phone: 540-222-7550                            Dealership Fax:

Dealership Email: Jen@patriotgolfcart.com                Cell Phone*:   540-222-7550

*To be used only to send Bintelli specials, sales, and News updates. The texts will always be during regular business hours. The cell number provided would only be used for text purposes.



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

**SCHEDULE A**

Bintelli's Warranty Claims Procedure

Dealer shall properly notify Bintelli via Bintelli's warranty forms and as follows Compensation for Parts Replaced under Warranty:

At the time that an Authorized Bintelli Dealer performs any "under warranty" service, the Dealer's agent must fill out a warranty repair request form through the Dealer Portal, which shall be submitted to Bintelli before the repair is completed. Failure to follow the procedure specified automatically precludes Bintelli from liabilities related to the Warranty repair specified herewith.

For the Authorized Bintelli Dealer to be able to provide this service, it is necessary that the vehicle owner / operator presents the retailer with proof of warranty registration completed at the time the unit is first delivered. Warranty restrictions are specified in Bintelli warranty documentation supplied to both Dealer and End user. Exclusions apply as noted in this documentation.

Parts catalogs are available upon request. The parts catalogs are provided to the Authorized Bintelli Dealers with the purpose of allowing them to become familiar with the replacement parts system as well as acknowledging their ability to order or purchase parts as it is necessary to affect repair of the unit.

In the case of warranty repairs all replaced parts are property of Bintelli. The Dealer will be required to retain defective parts for 1 month in case Bintelli requires that the defective part be returned to Bintelli prior to a replacement being sent, unless directed otherwise by the warranty department.

Bintelli represents that all replacement parts are both new and genuine. Only the following generic replacement parts may be installed without previous authorization: spark plugs, screws, clamps, fluids, tires, shocks, light bulbs, batteries, and fuses.

**SCHEDULE B**

Notices

All notices will be sent to the addresses listed on the signature page of the dealer agreement.

**SCHEDULE C**

If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force.

*PGL*

DocuSign Envelope ID: 6AC6A853-F5A2-44FE-A90C-8D8A7C0C683A



## Bintelli EV Dealer Warranty Policy

1. This limited warranty covers conversions to new vehicles, equipment furnished by Bintelli ("the company") in or upon a passenger vehicle. Vehicle has a 4 year limited parts-only warranty. Labor warranties are available for an additional charge, at the time of purchase, through our partner, EWG.

2. The company warrants to original purchaser that any defects in materials or workmanship, except as listed in paragraph #4 below, that occur within the time periods listed below ("the warranty period"), starting from the date of delivery, will be corrected by the company at its expense, in a manner described:

    a. Manufacture Warranties –These warranties are covered by the manufacture of the component, not by Bintelli directly. Lester Brand Chargers are covered for a period of four years. Eagle brand chargers are covered for a period of three years. Controllers are covered for a period of two years. US Batteries are covered for a period of 12 months. Full warranty disclosures for these manufacturers are available upon request.

    b. Bintelli Warranty – In addition to the manufacture warranties noted above. Bintelli will warranty the frame and all structure welds of the vehicle for a period of two years. All remaining parts not already mentioned in (a) or (b) or excluded in #4 below will be covered for a period of one year. Labor for repair is never included. The warranty included is a parts only warranty. Defective parts must be returned to Bintelli LLC before replacement.

3. Warranty parts will be sent or given to the customer or dealer when the dealer or original purchaser notifies the company that a defect exists and Bintelli determines, as a result of its inspection or investigation, that the defect was caused by improper material or workmanship.

4. The parts only warranty provided by Bintelli does not cover:
    a. Any costs or charges involved in transporting a vehicle or part to or from the repair facility.
    b. Any lost revenues to customer due to the defective part(s).
    c. Damages to any items caused by improper use, unauthorized repairs or modifications, attempts to operate any equipment beyond its rated capacities, or damage caused by lack of proper and reasonable maintenance.
    d. Any equipment furnished or installed by the buyer or Dealer
    e. Wear Items - tires, bulbs, fuses, bearings, brake pads, motor brushes, wiper blades, brake shoes.
    f. Any defects for components(such as radio equipment, charger, controller, batteries, etc.) which are covered by the individual component manufacturer's warranty).
    g. Any rental or replacement vehicle charges or costs associated with the need for warranty repair at our authorized facility.
    h. Any labor required to replace any warranty parts
    i. Rust and Paint related issues
    j. The motor if the vehicle is used in a rental or taxi style application

5. Warranty repairs listed above constitute the full extent of the company's warranty. There are no warranties which extend beyond those described herein, and the foregoing warranty is exclusive and is in lieu of all other warranties, whether written, oral, implied or statutory. In no event shall the company be liable for special or consequential damages or of the loss of use of the vehicle or loss of time or inconvenience to the buyer. Warranties are non-transferrable. Any disputes arising from this warranty are to be settled in Charleston, SC.



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# EXHIBIT F

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



## Bintelli LLC Dealer Agreement

This Dealership Agreement ("Agreement") is made this day _____1/17/2023_____ ("Effective Date"), by and between Bintelli LLC, (a South Carolina corporation), hereafter referred to as "Bintelli" and __Patriot Golf and Utility Vehicles__(dealership name), hereafter referred to as "Dealer".

PRODUCT SELECTION

Initial Order / Stocking Requirement: Dealer agrees to make an initial minimum order of at least _0_____ Bintelli Electric Vehicles within 2 weeks after signing this Agreement, unless Dealer is renewing their agreement and currently has at least ten (10) Bintelli vehicles in stock. If this provision is not complied with the entire agreement shall be rendered void and of no effect.

_X_ I am renewing my agreement and currently have at least ten (10) Bintelli golf cats in stock.
___ I am renewing my agreement and do not currently have at least ten (10) Bintelli golf carts in stock.
___ I am a new dealer that will place an order for at least the minimum initial order quantity above.

Active Dealer Status & Commitment:  Active Dealers in compliance with this agreement receive 24/7 access to the Bintelli Dealer Portal and Parts websites which includes up to date inventory status, wholesale parts pricing, current specials, dealer resources (including training videos, dealership forms, advertising materials, "how-to" guides, industry news, new product unveilings, and more!) Additionally, Active Dealers receive leads from Bintelli Dealer Locators, Online Pass Through, weekly free shipment of approved warranty parts, showroom sales resources, and a dedicated Bintelli account manager and support specialist.

Upon reaching initial order quantity, Dealer is required to continue to keep a minimum of ten (10) Bintelli golf carts in stock at all times. Additionally, Dealer is required to order a minimum average of _7___ golf carts from Bintelli each month while active under this agreement. If a period goes by where Bintelli alerts dealer that their trailing period has not met this minimum requirement and is not in compliance, Dealer will be given seven (7) days to place an order to increase the average to the required number. If still not in compliance seven (7) days later, Bintelli reserves the right to rescind the Active Dealer status without notice.

SECTION 1. DEALERSHIP

(A)Appointment
(I) Bintelli hereby appoints Dealer to be a retail Dealer of the product lines chosen in Product Selection, along with the accessories and spare parts distributed by Bintelli.

(B)Duration of Agreement
This Agreement and the Dealership created under this Agreement shall continue in force for 1 year from the date of execution unless terminated earlier as provided herein. If all of the provisions of this Agreement are complied with, unless either party gives written notice of its election to terminate this Agreement at least sixty (60) days

Dakota Giardino

PG

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07



prior to termination, it shall automatically be renewed one (1) time for an additional one (1) year period at the expiration of each period. A new agreement must be executed at the conclusion of year two (2).

SECTION 2. OPERATION OF DEALERSHIP

(A) Purchase Price
Dealer shall purchase the Bintelli Products only from Bintelli and pay Bintelli the dealer price in effect at the time the Dealer's order is received, less any applicable discount. Pricing to change without notice. Bintelli reserves the right to charge a deposit for all orders, regardless if the final payment will be made by cash, check, or floorplan.

(B) Terms of Purchase
Dealer shall pay Bintelli for its purchases of the Product or Parts at the price described in Section 2a, on the date of invoice prior to shipment of product unless otherwise agreed to in writing. If Dealer chooses to use their own shipping carrier, a pallet surcharge will be added to the invoice to cover the cost of the pallet and packing materials. There is a 20% restocking fee for any parts returned to Bintelli.

(C) Dealership Pricing
Bintelli takes under-cutting and price gouging very seriously. While you may sell a Bintelli Beyond for any price you desire, there are minimum ($500 below current pricing on BintelliEV.com) and maximum ($1,000 above current pricing on BintelliEV.com) prices that may be advertised online. Dealer may add prep, delivery, tax, tag, and title fees in addition to these prices. You may discount as desired at the time of sale. Any price gouging found will be given a one-time seven (7) day window to correct the issue. If the issue is not corrected and/or price gouging occurs a second time, Bintelli reserves the right to rescind Bintelli Active Dealer Status without notice.

(D) Title and Risk of Loss
MSO to the Product shall be issued and mailed to Dealer on the date on which payment is received by Bintelli. Prior to the Date of delivery, the risk of loss to the Product shall be on Bintelli. The risk of loss shall pass to Dealer on the Date of delivery.

(E) Use of Trade Name and Trademark and Price Changes
(I) Bintelli agrees that while this Agreement continues in force, Dealer may use the product trade name(s) and/or trademark(s) in connection with the advertisement and sale of products purchased directly from Bintelli. Bintelli's trade name(s) and/or trademark(s) shall not be affixed to or advertised in connection with any merchandise or service other than the products purchased directly from Bintelli.

(II) All advertising and promotional materials containing or referring to Bintelli's trade name(s) and/or trademark(s) shall be submitted to Bintelli for approval. Unless the result of a Tariff or exchange rate change, Bintelli agrees to advise Dealer of all changes in product prices not less than thirty (30) days prior to marketing any revised price.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



(F) Dealer's Obligations

Dealer agrees to:

(I) Use its best efforts to promote the sale and use of the products purchased from Bintelli. All Bintelli models (complete with pictures, specifications, features, pricing, and a quote request form) must be on Dealer website before Dealer's first order will be shipped and must remain on Dealer's website in order for Dealer to remain in Active Status. Bintelli can provide assistance with website edits if needed. Dealer will have full access upon payment of first order to pictures, videos, banners, logos and other resources to implement on their website.

I understand no vehicles will be shipped until complete

(II) Comply with all United States laws and regulations applicable to Bintelli Products including but not limited to those set forth by the Environmental Protection Agency, the National Highway Traffic Safety Administration, Department of Transportation (DOT), and corresponding State Vehicle Code. It is Dealer responsibility to know, understand, and adhere to the laws of their local city/state in regards to the products they stock and sell.

(III) Employ trained technicians that can repair any issue that occurs on a product Dealer sells. Dealer will support any and all Bintelli Products within their market, and shall provide warranty service to carried Bintelli Products, including parts replacement and/or repair, or any given procedure specified by Bintelli and/or state or Federal Government entity. All Bintelli warranties are parts only so Dealer may, at their discretion, collect labor expenses for repairs directly from customer.

(IV) All sales are final. It is the responsibility of the purchaser to inspect the entire shipment before signing the delivery slip. If any freight is missing, you MUST specify it on the delivery slip. Failure to do so will result in you giving up your right to a freight claim. If a delivery slip is signed and products are later to be found missing, they will not be replaced. All freight orders must be accepted. If damage occurs in transit, all damage must be explicitly noted on the bill of lading. Refusing a shipment will result in additional shipping expenses to purchaser. No refunds, returns, cancellations or exchanges for any reason after an order is approved verbally or in writing. Any disputes are resolved in Charleston County, South Carolina.

(V) Have a loading dock or ramps on site that can unload vehicles from the back of a semi-truck. Recommended ramps such as 144" x 14" Big Boy EZ Rizer Loading Ramps with a 2,000lb load capacity on Amazon.

I understand

(G) Advertising by Bintelli

Bintelli agrees that it will, from time to time, purchase and place advertising promoting the sale its products. All decisions regarding the use of national, internet, regional, or local advertising, or a combination thereof, or with respect to the selection of a particular medium or advertising content shall remain with the sole discretion of Bintelli and such advertising agencies or others as it may appoint. Nothing in this Agreement shall be deemed to prohibit or prevent Dealer from engaging in any advertising or promotion of the products in addition to advertising or promotions paid for by Bintelli.

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# BINTELLI

**(H)Online Sale Pass Through**

In an effort to quickly grow this brand of products, Bintelli retains the right to advertise and sell its vehicles online. If an online retail order is placed with Bintelli and the customer resides within 15 miles of Dealer (as the shortest route via Google Maps as deemed by Bintelli), Bintelli will offer a $1,500 profit to Dealer if Dealer currently has met all obligations of this agreement, is in Active Status, and has at least the initial order requirement number of vehicles in stock for each product line it represents. If Dealer chooses to decline the Online Pass Through, Bintelli reserves the right to sell direct to customer. To receive the dealer profits, Dealer is responsible for receiving and completing the PDI on the vehicle, and agrees to all future servicing and warranty work on the vehicle, as needed, during its warranty period and beyond. Dealer has the option to put the profit from the sale on their account as a credit to use immediately or can elect to have a check sent once a month for all owed profits. If Dealer chooses to use a vehicle already at their facility for the Online Sale Pass Through, Bintelli will reimburse dealer the actual cost paid on the vehicle, plus actual shipping cost to dealer, plus the $1,500 profit.

**(I)Leads**

Bintelli spends hundreds of thousands of dollars each year to generate leads for its dealer family. Dealerships in Active Status (having met their purchase commitments for the previous 6-months) receive any generated leads in their area for lines they actively carry and are in Active Status for. Bintelli leads are to be used to push Bintelli products only. Any evidence of Dealer using Bintelli leads to push customers on other brands of carts will result in Dealer losing Active Dealer Status, including but not limited to, the ability to receive all future leads or Online Pass Through.                    I understand

## SECTION 3. WARRANTIES

**(A)Warranty of Title**
(I) Bintelli warrants that it has good title to the products and the right to sell it to Dealer free of any proprietary rights of any other party or any other encumbrance.

(II) Bintelli shall not indemnify Dealer against any claim or liability based on Dealer's modification or conversion of the Product and/or the subsequent use of that modification or conversion.

**(B)Limited Warranty**
Bintelli includes different warranty terms and lengths for each product line. Please read warranty terms, exclusions and limitations listed in warranty guidelines as not all parts are covered for the full warranty periods.

**(C)Warranty Service**
Bintelli shall, at its own expense and option, either repair or replace any defective items of the product during the warranty period as specified in Section 3b, provided that Dealer has properly notified Bintelli via Bintelli's warranty form, as described in Schedule A attached to this Agreement and incorporated herein by reference as though fully set forth, and, upon inspection by Bintelli, Bintelli has found the product to be defective. Dealer's sole and exclusive remedy under this Agreement shall be limited to the repair or replacement specified herein. Dealer is entitled to

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07

**BINTELLI**

free shipping of warranty parts a maximum of one time per week. Additional shipments will be charged for shipping expenses.

(D) Warranty Conditions and Disclaimer

The foregoing warranties are contingent on the proper use of the product in accordance with the instructions and specifications published by Bintelli and shall not apply to any product that has been repaired or modified by persons other than Bintelli or their authorized Bintelli dealer. The express warranties set forth in this agreement are in lieu of all other warranties, express or implied, including without limitation, any warranties of merchantability or fitness for a particular purpose.

SECTION 4. TERMINATION

(A) Termination by Bintelli

Bintelli may terminate this Agreement if Dealer fails to perform any of the terms of this Agreement. If Bintelli elects to terminate this Agreement, it shall give written notice of termination to Dealer not less than thirty (30) days prior to termination unless the termination is due to failure to purchase the minimum requirement of vehicles per month, as no notice is required in this case. Terminated dealers, or dealers without any vehicle purchases within the last six months will be required to pay shipping charges for warranty part shipments thereafter.

(B) Termination by Dealer

Dealer may terminate this Agreement upon written notice of termination to Bintelli not less than thirty (30) days prior to the close of any calendar year, and this Agreement shall then terminate at the close of that calendar year.

(C) Repurchase of Product by Bintelli

Upon termination of this Agreement, Bintelli is not obligated to repurchase any Product from Dealer. Should Bintelli choose to repurchase product, Bintelli will reimburse Dealer at original purchase price of Product, less 20% for the current Model Year only. All shipping costs to be paid by Dealer and vehicles must be delivered in new condition to Bintelli.

SECTION 5. GENERAL PROVISIONS

(A) Notices

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to have been properly given when deposited in the United States mail, first class certified postage prepaid and addressed to the other party at the address for that party specified in described in Schedule C attached to this Agreement and incorporated herein by reference as though fully set forth.

(B) Assignment of Agreement

Neither party shall assign this Agreement or its rights hereunder without the prior written consent of the other. Any attempt to make such an assignment without the other party's consent shall be void and are considered to be grounds to terminate this agreement.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

**(C) Non waiver**

Bintelli and Dealer agree that no failure to exercise or delay in exercising any right, power, or privilege under this Agreement on the part of either party shall operate as a waiver of any right, power, or privilege hereunder. Bintelli and Dealer further agree that no single or partial exercise of any right, power, or privilege under this Agreement shall preclude further exercise thereof.

**(D) Severability**

If any part of this Agreement is found or deemed by a court of competent jurisdiction to be invalid or unenforceable, that part shall be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**(E) Governing Law; Venue**

This Agreement and any controversy arising out of or in relation to it shall be governed by the law of the State of South Carolina. Dealer hereby waives any right to assert any rights or defenses within any other jurisdiction or to require that litigation regarding this Agreement take place elsewhere.

**(F) Entire Agreement**

This Agreement is the complete and exclusive statement of the mutual understanding of the parties, and supersedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement.

**(G) Attorneys' Fees**

If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.

Dealership Owner Name: Jennifer Friend

Dealership Name : Patriot Golf and Utility Vehicles

Dealership Address: 12193 Balls Ford Rd

Dealership City/State: Manassas, VA

Dealership Phone: 540-222-7550

Dealership Email: jen@patriotgolfcart.com

REDACTED

Owner Birthday: ███████

Shipping address the same? X Yes ___ No

Do you need a liftgate? X Yes ___ No

Dealership Fax:

Cell Phone*: 540-222-7550

*To be used only to send Bintelli specials, sales, and News updates. The texts will always be during regular business hours. The cell number provided would only be used for text purposes.

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

IN WITNESS WHEREOF, this Agreement has been executed by the parties' authorized representatives on the date first written above.

Bintelli LLC, a South Carolina Corporation                2137 Savannah Highway Charleston, SC 29414

By: _____*Justin Jackrel*_____                                1/17/2023
    A2C316987DB4440...
President, Bintelli LLC.

                                                                              1/17/2023

DEALER                                                    I acknowledge I must have a qualified and competent technician on site for proper PDI, maintenance, and warranty support to my customers.

By: _____*Patriot Golf*_____
    72E863ABD2FB4D6...                                                    Initial ⎡ *PG* ⎤

---

**Dealership Declaration**

I, Jennifer Friend _____ (insert name) declare that my website is up to date with all Bintelli models including product pages with pictures, specifications, features, and a quote request form. I also declare that my posted prices are within, and will remain within the required minimum and maximum prices as set forth in this agreement.

By: _____*Patriot Golf*_____                              Date 1/17/2023
    72E863ABD2FB4D6...

---

**Account Representative Declaration**

I, Dakota Giardino _____ (insert name) declare that I have reviewed Dealer website and approve that it is currently in compliance with the requirements of this agreement.

By: _____*Dakota Giardino*_____                            Date 1/12/2023
    E8523782BE254AA...

Bintelli – 2137 Savannah Highway Charleston SC 29414
Phone: (866) 542-8677 - Fax: (843) 556-4080 - Website: www.Bintelli.com

⎡ *PG* ⎤

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07



ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

SCHEDULE A

Bintelli's Warranty Claims Procedure

Dealer shall properly notify Bintelli via Bintelli's warranty forms and as follows Compensation for Parts Replaced under Warranty:

At the time that an Authorized Bintelli Dealer performs any "under warranty" service, the Dealer's agent must fill out a warranty repair request form through the Dealer Portal, which shall be submitted to Bintelli before the repair is completed. Failure to follow the procedure specified automatically precludes Bintelli from liabilities related to the Warranty repair specified herewith.

For the Authorized Bintelli Dealer to be able to provide this service, it is necessary that the vehicle owner / operator presents the retailer with proof of warranty registration completed at the time the unit is first delivered. Warranty restrictions are specified in Bintelli warranty documentation supplied to both Dealer and End user. Exclusions apply as noted in this documentation.

Parts catalogs are available upon request. The parts catalogs are provided to the Authorized Bintelli Dealers with the purpose of allowing them to become familiar with the replacement parts system as well as acknowledging their ability to order or purchase parts as it is necessary to affect repair of the unit.

In the case of warranty repairs all replaced parts are property of Bintelli. The Dealer will be required to retain defective parts for 1 month in case Bintelli requires that the defective part be returned to Bintelli prior to a replacement being sent, unless directed otherwise by the warranty department.

Bintelli represents that all replacement parts are both new and genuine. Only the following generic replacement parts may be installed without previous authorization: spark plugs, screws, clamps, fluids, tires, shocks, light bulbs, batteries, and fuses.

SCHEDULE B

Notices

All notices will be sent to the addresses listed on the signature page of the dealer agreement.

SCHEDULE C

If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force.

DS
PG

DocuSign Envelope ID: AF14DD04-6179-45CC-AC67-A50C786FCF07

# BINTELLI

## Bintelli EV Dealer Warranty Policy

1. This limited warranty covers conversions to new vehicles, equipment furnished by Bintelli ("the company") in or upon a passenger vehicle. Vehicle has a 4 year limited parts-only warranty. Labor warranties are available for an additional charge, at the time of purchase, through our partner, EWG.

2. The company warrants to original purchaser that any defects in materials or workmanship, except as listed in paragraph #4 below, that occur within the time periods listed below ("the warranty period"), starting from the date of delivery, will be corrected by the company at its expense, in a manner described:

    a. Manufacture Warranties –These warranties are covered by the manufacture of the component, not by Bintelli directly. Lester Brand Chargers are covered for a period of four years. Eagle brand chargers are covered for a period of three years. Controllers are covered for a period of two years. US Batteries are covered for a period of 12 months. Full warranty disclosures for these manufacturers are available upon request.

    b. Bintelli Warranty – In addition to the manufacture warranties noted above. Bintelli will warranty the frame and all structure welds of the vehicle for a period of two years. All remaining parts not already mentioned in (a) or (b) or excluded in #4 below will be covered for a period of one year. Labor for repair is never included. The warranty included is a parts only warranty. Defective parts must be returned to Bintelli LLC before replacement.

3. Warranty parts will be sent or given to the customer or dealer when the dealer or original purchaser notifies the company that a defect exists and Bintelli determines, as a result of its inspection or investigation, that the defect was caused by improper material or workmanship.

4. The parts only warranty provided by Bintelli does not cover:
    a. Any costs or charges involved in transporting a vehicle or part to or from the repair facility.
    b. Any lost revenues to customer due to the defective part(s).
    c. Damages to any items caused by improper use, unauthorized repairs or modifications, attempts to operate any equipment beyond its rated capacities, or damage caused by lack of proper and reasonable maintenance.
    d. Any equipment furnished or installed by the buyer or Dealer
    e. Wear Items - tires, bulbs, fuses, bearings, brake pads, motor brushes, wiper blades, brake shoes.
    f. Any defects for components(such as radio equipment, charger, controller, batteries, etc.) which are covered by the individual component manufacturer's warranty).
    g. Any rental or replacement vehicle charges or costs associated with the need for warranty repair at our authorized facility.
    h. Any labor required to replace any warranty parts
    i. Rust and Paint related issues
    j. The motor if the vehicle is used in a rental or taxi style application

4. Warranty repairs listed above constitute the full extent of the company's warranty. There are no warranties which extend beyond those described herein, and the foregoing warranty is exclusive and is in lieu of all other warranties, whether written, oral, implied or statutory. In no event shall the company be liable for special or consequential damages or of the loss of use of the vehicle or loss of time or inconvenience to the buyer. Warranties are non-transferrable. Any disputes arising from this warranty are to be settled in Charleston, SC.

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# EXHIBIT G

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



# NORTHPOINT
COMMERCIAL FINANCE

### VOLUNTARY SURRENDER

Patriot Golf and Utility Vehicles, LLC ("Borrower"), having defaulted under the financing agreements between Northpoint Commercial Finance LLC ("**Northpoint**") and Borrower (collectively, the "**Agreement**"), does hereby release and surrender to Northpoint or its designated agent, all of Borrower's inventory that is financed by Northpoint (the "**Collateral**").

The Collateral is being released and surrendered so that Northpoint can sell the Collateral in accordance with applicable law and apply the net proceeds of the sale to Borrower's outstanding obligations under the Agreement. This Voluntary Surrender does not affect Northpoint's right to pursue any deficiency remaining after the net proceeds of the sale are applied to Borrower's outstanding obligations under the Agreement.

Northpoint reserves all of its rights and remedies whether arising under the Agreement or applicable law, and nothing in this letter Voluntary Surrender shall constitute a waiver or amendment of any of those rights and remedies.

Any signature delivered by facsimile transmission, by e-mail transmission of an Adobe file format document (also known as a "PDF file"), or by any other electronic transmission shall be deemed an original signature hereto.

AGREED AND ACKNOWLEDGED:

Patriot Golf and Utility Vehicles, LLC

By: _____
Print Name: Jennifer Friend
Title: Owner
Date: 3-6-25

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

## Exhibit A

## COLLATERAL

| Supplier | Invoice Number | Invoice Date | Model Number | Serial Number | Current Balance |
|---|---|---|---|---|---|
| Bintelli LLC | 24669 | 05/24/2022 | 4pr Lifted B | 7R3BB4230NC003782 | $7,312.38 |
| Bintelli LLC | 25193 | 06/16/2022 | B2 | XY06182207 | $759.20 |
| Bintelli LLC | 25193 | 06/16/2022 | B2 | XY06182217 | $759.20 |
| Bintelli LLC | 25193 | 06/16/2022 | FLORENCE | 165322126401067 | $900.00 |
| Bintelli LLC | 25193 | 06/16/2022 | FUSION | 165322020003049 | $959.20 |
| Bintelli LLC | 25193 | 06/16/2022 | FUSION | 165322120014668 | $959.20 |
| Bintelli LLC | 25193 | 06/16/2022 | TREND | 165322126028748 | $855.20 |
| Bintelli LLC | 25193 | 06/16/2022 | TREND | 165322126028894 | $855.20 |
| Bintelli LLC | 26650 | 08/09/2022 | 4PR | 7R3BA4232NC007187 | $8,316.44 |
| Bintelli LLC | 26915 | 08/18/2022 | 4PR | 7R3BB4238NC002816 | $7,506.44 |
| Bintelli LLC | 27156 | 08/25/2022 | 4PR BEYOND | 7R3BB4232NC004044 | $7,506.44 |
| Bintelli LLC | 27880 | 09/16/2022 | 4PR LIFTED | 7R3BA4231NC007147 | $8,293.94 |
| Bintelli LLC | 27904 | 09/19/2022 | 4PR LIFTED B | 7R3BA4234PC001720 | $8,293.94 |
| Bintelli LLC | 28000 | 09/21/2022 | 4PR LIFTED | 7R3BA4235PC001693 | $8,316.44 |
| Bintelli LLC | 28321 | 10/03/2022 | 4PR LIFTED | 7R3BA4230PC001715 | $8,271.44 |
| Bintelli LLC | 28321 | 10/03/2022 | 4PR LIFTED | 7R3BA4236PC001735 | $8,271.44 |
| Bintelli LLC | 28534 | 10/06/2022 | 4pr | 7R3BA423XPC001317 | $7,483.94 |
| Bintelli LLC | 28596 | 12/21/2022 | 4PR | 7R3BA4234PC001300 | $7,461.44 |
| Bintelli LLC | 31009 | 02/02/2023 | 4PR BEYOND | 7R3BA4233PC003989 | $8,735.25 |
| Bintelli LLC | 32088 | 04/14/2023 | 4PR BEYOND | 7R3BA4234PC002396 | $10,060.50 |
| Bintelli LLC | 32088 | 04/14/2023 | 4PR LIFTED | 7R3BA4234PC003726 | $9,685.25 |

# EXHIBIT H

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



# NORTHPOINT
## COMMERCIAL FINANCE

April 22, 2025

Bintelli LLC
6900 Weber Boulevard
Ladson, SC 29456

Re:    Repurchase Request: Patriot Golf and Utility Vehicles, LLC

Ladies and Gentlemen:

Northpoint Commercial Finance LLC ("**Northpoint**") has come into possession of the inventory listed on <u>Exhibit A</u>. Northpoint is requesting Bintelli LLC to take possession of the inventory and to repurchase the inventory in accordance with the Repurchase Agreement between Bintelli LLC and Northpoint.

If Bintelli LLC fails to take possession and repurchase the inventory within 14 days from receipt of this letter, then thereafter (i) Northpoint will no longer be responsible for maintaining and delivering possession of the inventory, (ii) Bintelli LLC shall be responsible for the inventory including taking and maintaining possession, and (iii) Bintelli LLC shall bear the risk of any theft, damage, destruction, or other loss occurring to the inventory. Thus, neither Northpoint's failure to maintain or deliver possession of the inventory after 14 days from receipt of this letter nor any theft, damage, destruction, or other loss occurring to the inventory after 14 days from receipt of this letter shall affect the amount of the Repurchase Price or Bintelli LLC's obligation to pay Northpoint the Repurchase Price.

Please contact me at 470-805-1403 to make arrangements to take possession of the inventory and make the repurchase payment **on or before <u>May 6, 2025</u>, 14 days from the date of this letter**. Thank you in advance for your cooperation.

Sincerely,

Eric C. Brown, Sr. Account Manager

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

# EXHIBIT A

## List of Inventory

| Supplier | Invoice Number | Invoice Date | Model Number | Serial Number | Financed Amount | Current Balance | Inv Age | Mfr Repurchase Liability % | Mfr Repurchase Liability $ |
|---|---|---|---|---|---|---|---|---|---|
| Bintelli LLC | 32088 | 4/14/2023 | 4PR BEYOND | 7R3BA4234PC002396 | $10,590.00 | $10,060.50 | 711 | 100% | $10,060.50 |
| Bintelli LLC | 32088 | 4/14/2023 | 4PR LIFTED | 7R3BA4234PC003726 | $10,195.00 | $9,685.25 | 711 | 100% | $9,685.25 |

ELECTRONICALLY FILED - 2026 Apr 08 4:13 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

PITNEY BOWES
$10.44 ⁰
US POSTAGE ⁱᵐⁱ
FIRST-CLASS
028W0002310909
2000443717
ZIP 29403
APR 10 2026



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

9589 0710 5270 3557 3705 55

# GRSM50
**GORDON REES SCULLY MANSUKHANI**
YOUR 50 STATE LAW FIRM™

677 King Street, Suite 450
Charleston, SC 29403

Northpoint Commercial Finance LLC
c/o Corporation Service Company
100 Coastal Drive, Suite 210
Charleston, SC  29492

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| | ) FOR THE NINTH JUDICIAL DISTRICT |
| COUNTY OF CHARLESTON | ) C/A NO.: 2026-CP-10-01796 |
| | ) |
| PATRIOT GOLF AND UTILITY | ) |
| VEHICLES, LLC, JENNIFER FRIEND, and | ) |
| GRANT FRIEND, | ) AFFIDAVIT OF PROOF OF SERVICE |
| | ) VIA US CERTIFIED MAIL |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| BINTELLI LLC and NORTHPOINT | ) |
| COMMERCIAL FINANCE LLC, | ) |
| | ) |
| Defendants. | ) |

I, Michelle A. Adams, being first duly sworn on oath, state that I am an employee of Gordon & Rees LLP and not a party of this action; that on the 27th day April, 2026, a copy of Plaintiffs' SUMMONS AND COMPLAINT was served upon Bintelli LLC, c/o Registered Agent Justin Jackrel, 6900 Weber Boulevard, Ladson, SC 29456, by US Certified Mail, Restricted Delivery, as evidenced by the copy of the Domestic Return Receipt, attached hereto as Exhibit A.

Dated: May 4, 2026

_Michelle A Adams_
Michelle A. Adams

Sworn to and subscribed by me this

_4th_ day of _May_, 2026.

_[signature]_

Notary Public for _State of South Carolina_

My Commission Expires: _12·1·2031_

> Joel Garrett Milliken
> Notary Public, State of South Carolina
> My Commission Expires   December 1, 2031

# EXHIBIT A

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



# USPS Tracking®

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

FAQs >

Remove ✕

**Tracking Number:**

## 9589071052703640477048

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item was delivered to an individual at the address at 11:47 am on April 27, 2026 in LADSON, SC 29456.

---

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

### Delivered
**Delivered, Left with Individual**

LADSON, SC 29456
April 27, 2026, 11:47 am

**Out for Delivery**

SUMMERVILLE, SC 29485
April 27, 2026, 6:25 am

**Arrived at Post Office**

SUMMERVILLE, SC 29485
April 27, 2026, 6:14 am

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean?** (https://faq.usps.com/s/article/Where-is-my-package)

---

**Text & Email Updates**

---

Feedback

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

| | |
|---|---|
| **STATE OF SOUTH CAROLINA** | ) IN THE COURT OF COMMON PLEAS |
| | ) FOR THE NINTH JUDICIAL DISTRICT |
| **COUNTY OF CHARLESTON** | ) C/A NO.: 2026-CP-10-01796 |
| | ) |
| PATRIOT GOLF AND UTILITY | ) |
| VEHICLES, LLC, JENNIFER FRIEND, and | ) |
| GRANT FRIEND, | ) **AFFIDAVIT OF PROOF OF SERVICE** |
| | ) **VIA US CERTIFIED MAIL** |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| BINTELLI LLC and NORTHPOINT | ) |
| COMMERCIAL FINANCE LLC, | ) |
| | ) |
| Defendants. | ) |

I, Michelle A. Adams, being first duly sworn on oath, state that I am an employee of Gordon & Rees LLP and not a party of this action; that on the 27th day April, 2026, a copy of Plaintiffs' SUMMONS AND COMPLAINT was served upon Northpoint Commercial Finance LLC c/o Corporation Service Company, 100 Coastal Drive, Suite 210, Charleston, SC 29492, by US Certified Mail, Restricted Delivery, as evidenced by the copy of the Domestic Return Receipt, attached hereto as Exhibit A.

Dated: May 4, 2026

_Michelle A Adams_
Michelle A. Adams

Sworn to and subscribed by me this

4th day of _____May_____, 2026.

_Joel G Milliken_

Notary Public for _State of South Carolina_

My Commission Expires: _12.1.2031_

Joel Garrett Milliken
Notary Public, State of South Carolina
My Commission Expires   December 1, 2031

# EXHIBIT A

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796

ELECTRONICALLY FILED - 2026 May 04 2:33 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001796



SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Northpoint Commercial Finance, LLC
C/O Corporation Service Company,
Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492

9590 9402 9648 5199 3275 82

2. Article Number (Transfer from service label)

9589 0710 5270 4069 9382 37

PS Form 3811, July 2020 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X  Tara Raleigh    ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
Tara Raleigh    04/27/25

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt